**Joan S. NEFF, Administratrix of the Estate of John W. Neff, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 354–65.**

United States District Court District of Columbia.

March 28, 1968.

---

1. See Annot., 94 L.Ed. 856 (1950).

Richard W. Galiher, Galiher, Stewart & Clark, Washington, D. C.

Charles J. Steele, Whiteford, Hart, Carmody & Wilson, Washington, D. C., for plaintiff.

John F. Murray, Philip Silverman, Department of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GESELL, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)

(1964). Plaintiff is the administratrix of the estate of John W. Neff, his surviving spouse and mother and next friend of his five minor children. Neff was the First Officer of a Martin 404 operated by Mohawk Airlines that crashed immediately following takeoff from the Rochester, New York, Airport on the afternoon of July 2, 1963. He was killed in the crash, together with Captain Dennis, the pilot, and some of the passengers. The liability of the United States is based on its operation of the control tower and related weather facilities. It is asserted that the control tower was negligent in authorizing the plane to take off when a thunderstorm was on the field and in failing to provide accurate complete current weather information to the crew after the plane left the ramp. The United States denies any negligence and alleges that in any event plaintiff is barred from recovery by reason of First Officer Neff's contributory negligence. Detailed evidence was taken during a trial lasting six days and the matter was then fully argued and briefed by counsel.

The Rochester Airport control tower was about 40 feet above the ground and had a clear unobstructed view to the east, north and west. Situated on the southern portion of the field, it looked across the field to the north, where the terminal was located. The airport weather station facilities were located at ground level in a building close to the tower and were connected to the tower by an instant "hot line" which made immediate communication either way possible.

The main runway, No. 28, runs approximately east and west halfway between the tower and the terminal. Landings and takeoffs are normally from the eastern end of the runway and such was the case on the afternoon of the accident.

### SEQUENCE OF EVENTS

The sequence of events and principal weather developments which occurred on July 2, 1963, preceding the accident, and the general background against which the issues of negligence alleged by both parties must be determined are set forth immediately below.

*3:13 p. m.* Captain Dennis and First Officer Neff took over the Martin 404, a twin-engine piston-type aircraft, at Ithaca and left for Rochester. There was a line of "quite intense" thunderstorms having the appearance of a "squall line" running NE to SW about 75 miles from Ithaca toward Rochester. Captain Dennis and First Officer Neff were aware of this condition.

*3:40 p. m.* The plane arrived at Rochester from Ithaca. There was a little more than a one-hour layover at this point before Mohawk flight 112 using the same plane and the same crew was scheduled to originate and depart Rochester at 4:45 p. m. for White Plains, New York, and, ultimately, Newark, New Jersey.

*3:50 p. m.* The crew went to the Operations Office in the terminal and spent some time reviewing the weather and flight information available.

Mohawk's customer service agent at Rochester spoke to Captain Dennis and First Officer Neff and mentioned an aviation severe weather forecast. All current weather, including a 4:00 p. m. hourly weather report set out below, came to the attention of the crew. Captain Dennis did not seek any additional weather data, relying on what was made available. The following weather reports were posted and known to the crew:

*U. S. Weather Bureau*

Amended Terminal Forecast #1, circuit 8022, July 2, 1963 2:45 PM EDT

Valid from 2:45 PM EDT Tuesday to 7:00 PM EDT Wednesday.

Rochester—ceiling 4,000 feet broken clouds, visibility 7 miles, wind west-southwest 16 knots, scattered thunderstorms. Possible briefly ceilings 500 feet sky obscured ½ mile visibility, heavy thunderstorms, hail, wind from the west at 40 knots with gusts to 65 knots. Chance isolated tornado. 7:00 PM EDT cold front passage. 25,000 feet thin scattered clouds. Winds northwest 10 knots. Occasionally 4,000

feet scattered clouds until 9:00 PM EDT

*All Mohawk Stations*

Post for Pilots and pass to any flights into areas mentioned.

Weather Bureau severe weather forecast indicates along and 60 miles either side from 60 miles southeast of Buffalo, N. Y., to 50 miles northeast of Burlington, Vt., expect scattered severe thunderstorms with extreme turbulence, hail to 1½ inches in diameter and maximum surface gusts 65 knots. Possibly an isolated tornado or two. Squall line forming in Ontario Canada. to vicinity of Buffalo and Youngstown, Ohio expected to intensify and move east south eastward at 40 knots.

Company pilot reports indicate a line of thunderstorms through western Pennsylvania from north of Johnstown, Pa. extending southeastward and building rapidly. Expect these thundershowers to move eastward.

(McIntyre, Flight Control, July 2, 1963, 2:53 PM EDT)

*Aviation Severe Weather Forecast*

Weather warning Kansas City Urgent Kansas City Forecast number 315 July 2, 3:15 PM. EDT

Aviation Severe Weather Forecast

Area one [evidence showed Rochester is in Area one]—Tornado forecast

A—Along and 60 miles either side of a line from 60 miles southeast of Buffalo, N. Y. to 50 miles northeast of Burlington, Vt. Valid from 4:00 PM. EDT to 10:00 PM EDT. Public forecast issued.

B—Scattered severe thunderstorms with extreme turbulence. Hail to 1½ inches in diameter. Maximum surface gusts 65 knots. Possibility of an isolated tornado or two. Few cumulus buildups maximum tops 6000 feet.

C—Squall line forming in Ontario, Canada to vicinity of Buffalo and Youngstown, Ohio. Expected to intensify and move east-southeastward at 40 knots.

*Hourly Sequence Reports*

Areas Sequences circuit 8022 July 2, 1963 4:00 PM EDT

Rochester—ceiling estimated 5,000 feet broken clouds, higher broken clouds 12,000 feet visibility eight miles 1007.6 millibars of pressure. Temperature 94° F, dew point 66, wind west-southwest 16 knots. Altimeter setting 29.76 inches of mercury.

*4:30 p. m.* Captain Dennis signed the flight plan for flight 112. The flight plan is not in evidence.

*4:40 p. m.* Thunder was officially heard at the airport weather station causing Chapman, who was then on duty, to make a special weather observation, set forth immediately below. This may be considered the official beginning of the thunderstorm near the field.

About this time the crew and passengers boarded the aircraft. When flight 112 was being loaded it is not clear to what extent thunder and lightning were noticed at that point on the field. Some passengers and the stewardess heard thunder and saw lightning. All agree that the sky was dark and getting darker. While the wind was generally mild, there were strong gusts from time to time.

Another Mohawk plane coming from Buffalo which had landed at Rochester on runway No. 28 at 4:38 p. m. taxied to a gate near flight 112. The pilot of the incoming flight saw a thunderstorm somewhere to the west that looked like any other storm. He saw no rain or lightning coming in.

*4:43 p. m.* The first engine of flight 112 was started. Chapman at the weather station of the airport, having heard thunder and seen lightning, made the following special observation, acting pursuant to weather regulations:

*TelAutograph Record*

Special Observation 4:42 PM EDT

Ceiling estimated 5,000 feet overcast, 8 miles visibility thunderstorm. Thunderstorm northwest moving eastward. Frequent lightning cloud to ground,

wind-northwest 18 knots. Observer 4:43 PM EDT

This observation was sent immediately to the tower at about 4:44 p. m. by a device called a TelAutograph, which provides instant reception at the other end. The observation was not passed on to the crew of flight 112 by the tower, as will appear later in more detail.

*4:44 p. m.* The second engine of flight 112 was started and the crew asked the tower for taxi instructions.

At this same moment an American Airlines flight was cleared for takeoff from runway No. 28. This flight's destination was Buffalo. The crew of flight 112 was undoubtedly aware of the takeoff clearance given the American Airlines plane. Flight 112 could have seen the takeoff and could even have heard contacts between the tower and American. There is no way of definitely determining whether this occurred.

*4:45 p. m.* The American Airlines flight took off from runway No. 28. This was also the time Mohawk flight 112 was scheduled to leave the gate and the plane started to taxi from the terminal to the runup area at the end of runway No. 28, having received the required clearance from the tower.

While taxiing to runway No. 28 rain began to fall and became quite heavy at times so that the plane's windshield wipers were operating. Wind was gusty at times but generally mild. There was a swirl dust storm east of the start of runway No. 28 noticed by one observer not in the plane.

When flight 112 reached the runup position there was some thunder, rain, and lightning off the field, and a bit of hail had fallen. All of these weather manifestations are typical of thunderstorms.

When flight 112 stopped just off the runway in position to move immediately into takeoff position, the rain was increasing. Runway lights were on. Visibility was still over one-quarter of a mile down the runway from the plane's cockpit. About halfway down the run-

way, approximately 2,700 feet and almost directly opposite the tower, there appeared to be a dark wall of rain moving from west to east up the runway toward the plane. This could be seen from the plane and the tower.

*4:46 p. m.* The tower authorized the American Airlines flight, then airborne, to turn westbound to get out of the precipitation.

*4:48 p. m.* The American Airlines flight advised the tower that it would like to go a little bit further south to get away from chop and permission was granted by the tower.

At the same approximate moment (4:48:41 p. m.) Mohawk 112 was cleared for takeoff on runway No. 28. With the plane still in the runup position, Captain Dennis called the tower stating, "We would like to make a left turn as soon as practicable to avoid those thunderstorms coming in from the west."

At this moment a visibility instrument known as a transmissometer located so as to give readings of runway visibility at about the middle of the runway suddenly recorded a sharp drop from a four-mile visibility reading to a one-eighth of a mile visibility reading. The thunderstorm was on the field. The transmissometer recorded in the weather station. This reading was not observed by Chapman, for reasons that will appear.

*4:49:26 p. m.* The tower advised Mohawk 112 to make a left turn on course, that wind velocity was 15, and cleared flight 112 for takeoff from runway No. 28 on the revised course requested.

*4:50 p. m.* Flight 112 moved onto the runway and almost immediately took off down the runway, picking up speed. The plane was still on the runway when it entered the dark rain wall area opposite the terminal. The plane promptly then left the ground, encountered lateral and vertical turbulence sharply at several intervals commencing at about a 15-foot height, rose to around 100 feet into violent turbulence, tilted left, right, and again left, and went into a semi-nose-up stall and crashed on the airport grounds

with its left wing down. The crew made no effort to abort the flight, although this could have been accomplished safely at any time before the plane reached the rain wall.

The plane used for flight 112 was in sound operating condition. It was not overloaded and its instruments, including radar, were in good working condition. It was operated from the proper runway.

It was the thunderstorm which enveloped flight 112 immediately at takeoff that caused the plane to crash. The storm had typical manifestations of thunder, lightning, hail, gusts of wind, and turbulence. The backdraft or eddy, a typical aspect of such storms, contributed. There was a 180° wind change involved which necessarily caused the plane to lose buoyancy. This, coupled with the violent turbulence of the storm, the added weight of the rain and other factors, forced the ship out of control and into a crash, in spite of the combined efforts of the crew.

### THE CLAIM OF NEGLIGENCE

The parties have vigorously contested the responsibility of the tower and the crew under the circumstances outlined above. The United States contends that the tower is little more than a traffic policeman operating with almost no discretion and merely applying formal rules designed to govern the movement of outgoing and incoming planes. It is the crew, the United States says, that determines whether and how the flight will be made. Plaintiff asserts that quite the contrary is the case; that the flight is governed by tower instructions from takeoff to landing at destination; that minimum takeoff limits are established by Government regulation, which the crew must obey; and that the tower has the ultimate responsibility for safety at the time of takeoff, in flight and at landing.

Neither of these positions is completely correct. Our system of air traffic regulation is more sophisticated and better designed to protect the public and avoid human error than either of the categorical views suggest. Whenever a plane is moving, whether on the ground or in the air, the captain has the final and ultimate responsibility. He is, however, in constant contact with the ground and guided by the Government control facilities located at several points. The pilot can refuse to take off when cleared but cannot take off if not cleared. He can request a different runway or a different routing and, if cleared, can proceed accordingly. If he encounters weather difficulties en route he can ask permission to go in a different direction or to a different level and, again, if cleared, can proceed. Where his various clearance requests are consistent with air traffic regulations and established safety procedures, the United States facilities give the permission he seeks. When permission is not granted for safety or traffic control reasons, the pilot continues to fly under conditions set from the ground.

In short, there is a close working relationship contemplated between the Government-operated tower, control centers and weather facilities on the one hand, and crew on the other. The responsibility is mutual and coordinated at all times. Each, however, has superior knowledge in some respects over the other. The crew knows the condition of the aircraft, its capabilities, and must deal with the unusual and unexpected in flight. The tower, in this age of electronics, has the superior knowledge and capability where questions of traffic control and weather are involved. While crews have weather training and know that "the air is an unforgiving element," those in the tower, who also have weather observation training and who are in instant contact with weather stations in the area, have available more instruments, more information and more weather knowledge. The crew is highly dependent on and relies on accurate and sophisticated weather guidance from the tower, a responsibility which the Government has undertaken and must fully and completely carry out.

The Government's responsibility is to promote air safety. This responsibility includes a duty to promulgate rules and regulations to provide adequately for safety in air commerce. 49 U.S.C. § 1421. A very detailed series of procedures and regulations have been established by the Government under this general delegation from Congress governing the activities of weather stations and tower control personnel. Only a few of many need be cited to illustrate the pervasive and all-inclusive nature of the responsibilities the Government has undertaken in this regard. For example, the Air Traffic Control Manual issued by the Federal Aviation Administration specified, among other things, in Section 352.1 that:

"Whenever storm areas such as apparent thunderstorms, rain showers or squall lines can be discerned on the radar display, information concerning them shall be provided to pilot *when considered advisable* by the controller." (Emphasis supplied).

Similarly, the Facility, Equipment and Operation procedures with respect to visibility reporting procedures include the following two directives:

"471.1 Visibility observation shall be taken from the control tower during periods when the visibility at the usual point of observation is less than 4 miles. Such observations shall be taken by weather station personnel when available, or by control tower personnel when weather station personnel are not available. * * *

* * * * * *

"471.5 Visibility observations taken by control tower personnel are considered official as soon as the observation is recorded in the tower. Therefore, such visibility observations *may be transmitted to pilots or aircraft whenever necessary. * * *"* (Emphasis supplied).

The recent decision in Hartz v. United States, 387 F.2d 870 (5th Cir., 1968), overruling Hartz v. United States, 249 F.Supp. 119 (D.C.), on the issue of the duty to warn, is important here. The Court held that the tower's duty is not restricted to the manuals and regulations. The Court said:

"We disapprove the view that the duty of an FAA controller is circumscribed within the narrow limits of an operations manual and nothing more. We approve the view expressed by the Court of Appeals for the Second Circuit in Ingham v. Eastern Air Lines, Inc., 373 F.2d 227 (2d Cir. 1967), as follows:

' * * *

'It is now well established that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently.' " 387 F.2d 873.

See also Indian Towing Company v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

■ While a much fuller and more detailed review of the numerous regulations and procedures could be made, it will serve no purpose. It is apparent that in the area of weather reporting and the related operations of control towers a complete responsibility has been assumed by the Government under terms and conditions that require the exercise of the highest skills to be applied according to exacting and continuously high standards as particular circumstances dictate.

■ Tragic accidents have occurred from pilot error. Tragic accidents can also occur from weather reporting errors on the part of those on the ground. In neither instance is the fault intentional, but in each situation the responsibility should rest where a clear and significant duty is not performed with reasonable care under the circumstances and the resulting dereliction is the proximate and immediate cause of a crash. Each airline accident.incident must be carefully considered in the light of its particular facts. There is no automatic rule which

can fix responsibility on a control tower or a crew where a weather accident occurs.

At Rochester on the summer afternoon of the accident, traffic was very light and there was ample opportunity for the tower to advise flight 112 of all weather developments, unimpeded by any other conflicting priority responsibilities. Tower personnel, moreover, had a substantial advantage over the crew to judge the weather conditions developing on the field. The tower was in a better location to observe the approach of this particular storm coming in from the west because of the tower's height and its favorable position at right angles to the runway, which was the path of the storm's approach. The crew's vision was, at ground level, somewhat impeded by rain on the windshield at an angle that masked the speed of the "rain wall." The crew preparing for takeoff had many immediate duties. The tower had responsibility to check weather and visibility.

A review of facts relating to the operation of the weather station is now pertinent. The personnel at the weather station expected the thunderstorm to hit the field. For this reason Williams stayed overtime to assist Chapman, who took over the shift at the weather station at 4:00 p. m. Knowing that a thunderstorm was expected to hit the field, it was Chapman's responsibility to keep a visual watch and Williams was responsible for tracking storm developments on the weather radar. The radar scope showed a severe thunderstorm nearby, growing in intensity, and approaching the field. At 4:30 p. m., Williams had advised Chapman that the storm was moving at 35+ m. p. h. toward the field and Chapman, who could read weather radar, examined the scope at about this time. At 4:40 p. m., when Chapman took the special observation after he heard thunder and saw lightning, it appeared to him that the storm was four or five miles away. Thus, the information available to him indicated the storm could well hit the field by 4:47 p. m. He had a duty, according to his own testimony, to consult with the tower if he knew something of significance the tower didn't know. He had this knowledge and didn't report to the tower. Williams, who for some reason was not called as a witness by the United States, did not report the radar information known to him. From 4:45 p. m. to 4:50 p. m., Chapman, pursuant to other duties, was briefing a Navy pilot who had dropped in to get weather information. He kept little if any lookout, although his office looked over the field at ground level and he could see the runway and the progress of the storm's approach. Chapman made no effort to determine whether planes were about to land or take off around this time.

Considerable evidence was taken concerning the transmissometer at the weather station of Rochester Airport. This, as already indicated, is a device for measuring visibility. It is installed at many airports, has proven reliable, and is accurate within narrow margins. The transmissometer at Rochester, which recorded on a panel of instruments in front of Chapman's position, took visibility readings from close to runway No. 28 at about the midpoint of the runway. It was functioning accurately in the weather station at the time of the takeoff. The instrument had been in place for some years but had not been officially commissioned. Weather personnel were under instructions to monitor it for accuracy prior to commissioning. This was being done by Chapman from time to time and he used the instrument as an aid in making his weather observations. The transmissometer had no "readout meter" but could be read by checking a graph. At 4:48 p. m., when the abrupt drop in visibility to about one-eighth of a mile was recorded, flight 112 had not received the revised clearance and had not taken off. Under the official regulations governing air traffic control procedures, "take-off clearance should normally be issued after the aircraft has taxied to the end of the runway-in-use or the run-up area adjacent thereto" and "take-off clearance shall be denied to the

pilot of any air carrier or commercial aircraft carrying passengers or property for compensation or hire whenever: * * * runway visibility for the departure runway is less than one quarter of a mile * * *". Since the transmissometer had not been officially commissioned, its recorded information could not, under the regulations, be accepted as the official visibility reading. A visual determination of visibility was required of the tower personnel. The one-eighth of a mile visibility reflected on the instrument was not reported to the tower since it was not noted by Chapman, who could have relayed what it showed immediately by "hot line" to the tower. There was time to stop flight 112. Tower personnel were not paying much attention to the weather conditions developing on the field. Alerted by the transmissometer reading, the tower would have visually noted that visibility had sharply changed to below one-quarter of a mile and hence the flight should not be cleared. The crew had been given a much higher visibility report and, in fact, still had visibility from the plane at the end of the runway of more than one-quarter of a mile, although visibility on portions of the entire runway was much less.

Consider now the situation in the tower. Chapman had promptly reported his 4:42 p. m. special weather observation to the tower. Howell, who received the special weather observation TelAutograph message in the tower well in time to pass it on to flight 112, was not concerned with what was going on on the field. He claims not to have known flight 112 was at the gate, or that American was about to take off, and apparently did not look out of the tower except in the most casual way. His duties concerned control of planes in flight and he had a scheduled weather broadcast to make to planes in flight so he completed the broadcast, referring to the special weather observation, without calling the message to the attention of his two colleagues in the tower who were responsible for handling flight 112 on the ground and while it was in its immediate departure flight. His colleagues had not noticed the message when it came in because, for some unexplained reason,[1] all three men in the control tower failed to hear the buzzer which rang two or three times when the message came from Chapman. Thus a message pointing to the existence of a thunderstorm near the field was relayed to planes in flight but not to Mohawk flight 112 then on the field. Experienced pilots would have found the message significant and relied on it in making a decision whether or not to take off.

Thorp, the local controller in the tower, had seen radar echoes reflecting the severe approaching storm when he came on duty at 4:00 p. m. He had seen lightning before giving the initial takeoff clearance. If he had known of the special weather observation he would have relayed the information to flight 112 directly or through ground control. Howell did not bring it to his attention. Suffrin, operating a type of radar used for traffic control in a room below the tower, was in direct touch with tower personnel. Commencing at 4:00 p. m. he saw an intense storm cell approaching the field on his radar. He knew it was going to hit the field, that it was on the field by 4:48 p. m., and immediately imminent before that time. He did not bring this information specifically or otherwise to the attention of the tower. When he approved the revised takeoff clearance he did not convey his radar observations to the local controller, although he knew the thunderstorm had hit the field. It was not his practice to do this. None of the men in the control tower were alert to the changing weather conditions and, indeed, they made *no conscious* effort to look out and observe, relying on the weather station,

---

1. An electronic repair technician was apparently in the tower cab at these crucial moments, although Howell did not remember this fact. This individual was not called as a witness.

which also was taking only occasional and casual observations.[2]

The Government representatives do not admit that they saw the thunderstorm approach and sweep across the field and up the runway toward the takeoff end of runway No. 28. That this phenomenon occurred cannot be disputed. The storm's progress, identified by a forward wall of rain, was chartered effectively by plaintiff's weather expert based on the reported data and the expert's conclusions, which find strong support in the testimony of neutral observers, are accepted. The short of the matter is that if the Government representatives, particularly those in the control tower, failed to see the storm on the field they were negligent. If they saw it and failed to notify the plane after it left the ramp under the circumstances existing in this case they were negligent.

■■ The Government had a duty to provide the taxiing plane with all significant relevant weather information. This duty existed whether or not specific regulations or operating practices required that particular weather information be transmitted. If the Government has new, significant, and immediate relevant information that might have affected the crew's takeoff decision, and there was opportunity to provide it after the plane left the ramp, then the Government will be held liable, even though the regulation did not explicitly require the information to be transmitted. This is the governing rule that the Court has applied, guided by such cases as Hartz v. United States, 387 F.2d 870 (5th Cir., 1968). See also Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62 (1955), and Indian Towing Company v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

■ The Government was negligent in several major respects:

(1) It failed to advise the crew that the storm was expected to hit the field at takeoff time, as the weather personnel well knew.

(2) It failed to relay the special weather observation of 4:42 p. m. to the plane before takeoff.

(3) Personnel in both the weather station and the tower failed to keep an adequate lookout and advise the plane of the diminishing visibility conditions attendant on the approaching storm. They failed to observe and bring the sharp visibility change to the attention of the plane. The weather visibility at the middle of the runway before takeoff required the tower to cancel the flight in accordance with the controlling regulations.

Each of these lapses alone is sufficient to establish negligence since in each case the information would have had a significant impact on whether the crew would or should take off. These lapses individually and collectively were a proximate and direct cause of the accident. The duty to impart weather information to the plane was clear under the circumstances. This duty was not performed. Even if the visibility did not require cancellation of clearance, the information from the tower might well have caused a delay in takeoff or a refusal to take off and this is sufficient to find the Government negligent. Ingham v. Eastern Air Lines, Inc., 373 F. 2d 227 (2d Cir., 1967). Thus, the Government's negligence is clearly established.

2. The weather-gathering facilities and procedures at Rochester on this day were far from ideal and operating deficiencies may well have contributed directly and materially to the accident. The weather station was undermanned; the transmissometer had not been commissioned because it had no readout meter, thus making it more difficult to use; there was no machine for reading wind gusts, although the wind indicator reflected gusts when observed; a number of entries required by weather reporting procedures were not made, indicating laxness. There was a breakdown in communication between the weather station and the tower.

## THE DEFENSE OF CONTRIBUTORY NEGLIGENCE

The Court now considers the defense of contributory negligence, which would be a total bar under applicable New York law. The United States contends broadly that the crew knew or should have known everything the tower knew or should have known and therefore should not have taken off, even though cleared. Pilots fear and avoid thunderstorms. Mohawk crews had been repeatedly warned of the dangers of taking off or flying in thunderstorms and were trained to avoid thunderstorms if at all possible.

The Martin 404 had a weather radar in the cockpit. The essential purpose of this radar was to observe thunderstorms while the plane was in flight. Mohawk's operating manual required the radar to be tested before takeoff to determine that it was in operating condition. It took about four minutes to warm up the radar. It was impossible and improper to test radar near the terminal for fear of radiation damage or injury to the equipment, but the plane's radar could be tested and actually used while the plane was on the ground so long as it was in an open area such as the end of the runway. In order to use the radar effectively, however, from a ground position it would be necessary to tilt the antenna to cast the beam upward and hence minimize ground clutter. The radar also had to be tuned or focused once in operation. It was not customary for crews to use the radar for thunderstorm detection from the ground, although this could be done. Customarily the radar was warmed up and ready to be turned on as soon as a flight took off. At time of takeoff the crew usually is preoccupied with tower communication, the numerous checks that have to be made and other steps preparatory to takeoff. There is no way of definitely knowing whether the crew of flight 112 used its radar to check the approaching storm. It probably did not. No regulation or operating practice required it to do this.

Cockpit radar was but one of two methods the crew had to obtain more precise information concerning the storm. The customary and usual procedure would have been for the crew to ask the control tower for more information if, when the plane was in the runup position, there was reason for the crew to question the validity of the clearance given in the light of the rain wall down the runway and the other weather manifestations which may have appeared to the crew at the time. This the crew did not do; apparently choosing to rely on what could be seen and what had already been learned by examining the weather observations available.

The United States urges that the crew was negligent in not using its radar from the ground and in not calling the tower. Captain Dennis would have been responsible for any tower communication since he was handling these communications while First Officer Neff handled the immediate takeoff piloting. Either member of the crew could have operated the radar, but, again, it would more likely have been Captain Dennis. The Government's argument on these points is premised on the assumption that the crew did not act as prudent men with reasonable care for their own safety. The difficulty with this argument is that there is no definite demonstration that the crew was sufficiently alerted to the imminence of a thunderstorm on the runway to warrant these extra precautions.

The Court is persuaded by the proof as a whole that neither Captain Dennis nor First Officer Neff would have taken off into the wall of rain some 2,700 feet down the runway if they knew they were taking off directly into the heart of a thunderstorm then hitting the field. A takeoff in heavy rain is not the same as a takeoff into a thunderstorm. The first is not unusual; the latter is dangerous and contrary to sound operating practice.

Thunder and lightning are the indicia of a thunderstorm as distinguished from a rain storm. It is highly questionable

that the crew was aware that the rain wall contained a thunderstorm or were aware of the speed of its approach. Engine noises of a piston plane could muffle thunder noise; there were apparently no thunderclaps but only rolling thunder sounds. There was no evidence of lightning on the runway. Lightning may not have been particularly apparent to the crew whose view was adversely affected by the heavy rain on the windshield. It is difficult to judge speed of storms when in a cockpit on a runway.

As far as First Officer Neff is concerned, his seat at the controls on the left of the cockpit provided considerably less opportunity to view or appraise the wall of rain on the runway than Captain Dennis had during the crucial period of the taxi run from the terminal south to runway No. 28. Thus, on all the evidence, the Court concludes that the crew, or at least First Officer Neff, unlike Government weather and tower personnel, was not aware that the thunderstorm was on the field.

If, however, the contention, vigorously advanced by the United States, that the crew should have known a thunderstorm was on the field is accepted, the continuing duty of the tower to advise the crew as to weather conditions must be considered in the light of the last informative message received at the tower from the crew. When the crew before takeoff asked for permission to turn left *"to avoid those thunderstorms coming in from the west"* it was clear that the crew did not realize that the storm was *on the field*. If the tower had been performing its duties with reasonable care there is no question but that the tower personnel would have known and clearly observed that the violent storm was in fact on the field, that the crew did not realize this fact and was at hazard. There was still opportunity to warn and prevent the impending accident. Thus, while the Court has not accepted the claim of the United States that the crew should have known the storm was on the field, even if this claim is accepted the Government's supervening negligence continued and was the proximate cause of the accident. Prosser, Torts, p. 290 (1955 ed.).

This leaves for consideration one final question: whether, upon approaching the rain wall down the runway during takeoff, First Officer Neff should have aborted the flight before it reached or as it reached the rain wall, at which point, under the operating conditions prevailing, takeoff of the flight could have been prevented. Here the relative responsibilities of Captain Dennis and First Officer Neff must be particularly considered. The decision to abort was upon Captain Dennis. The Court makes no conclusion that the flight should have been aborted under the circumstances but the failure to abort the flight cannot be relied on by the United States to establish contributory negligence on the part of First Officer Neff. Captain Dennis had permitted First Officer Neff to fly at takeoff and Neff was occupying the pilot's seat. He was not authorized to do this under company procedures. Captain Dennis still had full command responsibility for the flight at all relevant stages and First Officer Neff was subject to his orders and command. If the takeoff should have been aborted, this was Captain Dennis' responsibility, not First Officer Neff's, and at this crucial juncture of the flight any disagreement by Neff with Dennis' decision would have endangered the flight.

The Court finds that First Officer Neff was not negligent, given his crew responsibilities and the information available to him. The situation as he then saw it did not warrant his taking the extreme step of disobeying Captain Dennis' orders at takeoff. The fact that First Officer Neff had the controls, contrary to company regulation, was not shown to have contributed to the accident in any way. First Officer Neff was experienced in the Martin 404. He exercised reasonable and ordinary care un-

der the circumstances confronting him. Any negligence on the part of Captain Dennis that may have contributed to the accident does not bar plaintiff from recovery and accordingly it is not necessary to deal with this question in view of other findings the Court has made. Ingham v. Eastern Air Lines, Inc., 373 F.2d 227, 237 (2nd Cir., 1967); State of Maryland, for Use of Meyer v. United States, 257 F.Supp. 768, 773 (D.D.C. 1966). The burden of proving contributory negligence is on the United States. There is a well-established presumption that airline pilots act with diligence and due care when their lives are at stake. Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 199, 221 F.2d 62, 72 (1955). The Court finds that the United States has not met its burden. First Officer Neff was not contributorially negligent in fact or in law.

## DAMAGES

Accordingly, the Court must assess damages. The Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1964), refers to "the law of the place where the act or omission occurred." Both parties are agreed that damages are to be awarded according to New York law. The amount recoverable in an action for wrongful death in New York is governed by section 132 of New York Decedent Estate Law, McKinney's Consol.Laws, c. 13. That section provides:

> "The damages awarded to the plaintiff may be such a sum as * * * the court * * * deems to be a fair and just compensation for the pecuniary injuries, resulting from the decedent's death, to the person or persons for whose benefit the action is brought. * * * *"

■ What constitutes "fair and just compensation" depends upon all of the facts in any given case. Rogow v. United States, 173 F.Supp. 547 (D.C. 1959). The main elements to be considered are the age of the decedent, his health, expectations, earning ability, in-

come, the prospect of increase of income, the number, age, and situation of those dependent on him for support, and his disposition to support them well or otherwise. Dimitroff v. State, 171 Misc. 635, 13 N.Y.S.2d 458 (1939). The precise question is: "What were the probable chances of pecuniary benefit from the continuance in life of the decedent worth under all circumstances?". Arnold v. State, 163 App.Div. 253, 148 N. Y.S. 479 (1914).

First Officer Neff was 31 years old when killed on July 2, 1963. He was in good health and had a life expectancy of 71 years. Mrs. Neff, who was 30 years old at the time of her husband's death, has a life expectancy of 76 years. She has five children between the ages of 10 and 4, the youngest of whom was born about a month after the accident.

■ In order to compute the actual damages to be awarded in this case, the Court has determined the present value of First Officer Neff's expected net earnings after taxes and the present value of the retirement pay he would have received between the ages of 60 and 71. From the sum of these items the amount he would have taken for his own use has been subtracted. In addition, funeral expenses and a sum to represent compensation for loss of parental care and guidance have been added. Having determined the total damage figure, the Court has awarded appropriate portions to Mrs. Neff and to First Officer Neff's five minor children.

First Officer Neff could reasonably have been expected to fly until mandatory retirement at age 60 and steady advancement could be expected. He was in good health and the nature of the industry made his steady progress to captaincy practically certain. The proof shows that First Officer Neff's compensation, which was approximately $10,000 at the time of the accident, would have increased to $19,000 by 1967, and thereafter at the rate of six percent a year until captain's pay of $30,000 was reach-

ed in 1975. From 1975 until his retirement in 1992, his pay would have remained at $30,000. On this basis, First Officer Neff's gross earnings as a pilot would have amounted to $748,051.

From $748,051 gross earnings, the Court has deducted a reasonable amount for estimated Federal Income Taxes. Given the size of the gross earnings figure and the fact that the judgment is against the United States, such a deduction, albeit imprecise, may properly be made under New York law. See LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266 (2d Cir., 1965); United States v. Sommers, 351 F.2d 354 (10th Cir., 1965); see also Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308 (2d Cir., 1964); McWeeney v. New York, N. H. & H. R. R. Co., 282 F.2d 34 (2d Cir., 1960), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960); Montellier v. United States, 315 F.2d 180 (2d Cir. 1963); O'Connor v. United States, 269 F.2d 578 (2d Cir., 1959). In this case, the Court has deducted $146,816 as estimated Federal Income Taxes.[3] As a result, First Officer Neff's net earnings, which is the amount that would actually have been available for support of the entire family, are $601,235.

Based on actuarial testimony unchallenged by the United States, and using 4½ percent for the first 15 years and 3½ percent thereafter, the present value of the $601,235 which would have been earned in 1963–1991 is $301,500.

The evidence showed that at the time of his death First Officer Neff used approximately one-quarter of his earnings for himself. This appears to be a generous figure which would not have sustained as the five children became older. On the other hand, there can be no actual proof that First Officer Neff would have continued to support his children beyond minority. While there is some support for the proposition that a parent will be presumed to spend more on himself after his children reach 21, O'Connor v. United States, 269 F.2d 578, 583 (2d Cir., 1959), it would seem that New York has no set rule on such matters. Given the likelihood that First Officer Neff would use less than 25 percent of net earnings when all five children were in school, and given a nationwide trend towards more and longer schooling, the Court has applied a flat 25 percent reduction to $301,500 in allowing for the amount First Officer Neff would have spent on himself prior to his retirement. It is assumed that Mrs. Neff would have received a like amount during this period.

Reducing $301,500 by 25 percent, or $75,375, results in $226,125 net earnings available to Mrs. Neff and the children prior to First Officer Neff's retirement. Of this amount, $75,375 shall go to Mrs. Neff and the remaining $150,750 to the children.

 Under New York law, funeral expenses may properly be awarded in a

---

3. The figure of $146,816 was arrived at in the following manner: Between 1963 and 1975, Neff's average income would have been $22,300. He would have had the full seven exemptions during this entire period, for the oldest child will not be 21 until 1978, and the youngest until 1985. At present rates (and it was assumed here that Federal Income Taxes would not go down over the period between 1968 and Neff's retirement in 1992), the tax on $22,300, with seven exemptions and the standard deduction, is $3568 per year, or $42,816 for the twelve years.

Between 1975 and 1991, Neff would have been taxed on $30,000 with an average number of four exemptions (seven until 1978; two after 1985). This would result in a yearly payment of $6500, or $104,000 for 16 years. The sum, therefore, of the total tax payments for the period 1963–1975 and 1975–1991 is $146,816.

Since there was no firm basis for estimating possible deductions from gross income during any of the years prior to Neff's predicted death in 2002, it was felt that the amount which would have been paid as state tax, as well as all taxes on retirement income, could be held to equal the amount of tax savings which would have resulted from deductions.

wrongful death action. Dibble v. Whipple, 281 N.Y. 247, 22 N.E.2d 358 (1939). The proof shows that $1,172.21 was spent on First Officer Neff's funeral and that sum will be awarded to Mrs. Neff.

The Court finds that First Officer Neff, had he lived, would have received a pension, or retirement pay, in the amount of $1,044 a month for the ten years after retirement. Of the total sum of $125,280, it is assumed that Mrs. Neff would have received 50 percent, or $62,640. The present value of such an amount is $17,852 and that sum, too, will be awarded to Mrs. Neff.

Mrs. Neff, then, will recover $75,375 as her share of net pre-retirement earnings, $1,172.21 for funeral expenses, and $17,852 as the present value of one-half her husband's pension. This results in a total award to Mrs. Neff of $94,399.21.

 The only remaining item of damages is loss of parental care and guidance. Such an award is permitted under New York law and is made directly to the children. Tilley v. Hudson River R. Co., 24 N.Y. 471 (1862).

 The proof shows that First Officer Neff was a strong family man and was interested in such fields as antiques and photography. He was a religious man, the family was close and Mrs. Neff has not remarried. As an active pilot, First Officer Neff had more than the usual time given a father to be home and to participate in family life. The children, as a group, had 89 years of minority left to them at the time of the accident and the Court finds that $1,000 per child year, or $89,000, is a reasonable

figure to compensate the children for the loss of their father's care and guidance. Rogow v. United States, 173 F.Supp. 547, 562 (D.C.1959); Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 588, 96 A.L.R.2d 1085 (2d Cir., 1961).

The children as a group will recover $150,750 as their share of net pre-retirement earnings, and $89,000 for loss of parental care and guidance. The total sum of $239,750 will be apportioned as follows:[5]

17 percent, or $40,757.50, to John Neff

18 percent, or $43,155.00, to Karen Neff

19 percent, or $45,552.50, to Mari Neff

22 percent, or $52,745.00, to Shiela Neff

24 percent, or $57,540.00, to Christopher Neff.

The Court assumes and directs that expenses of the law suit, including attorneys' fees, shall be divided proportionate to the amounts they take among Mrs. Neff and the individual children. The Court suggests that a guardian or guardians immediately be appointed for the children.

Judgment for the plaintiff in the amount of $334,149.21. Costs shall be taxed against the United States, 28 U.S.C. § 2412 (1964), and interest shall run from the date of judgment.

This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law under Rule 52, Federal Rules of Civil Procedure. Counsel shall settle an appropriate order within seven days.

5. The percentage figure assigned each child was arrived at in the following manner: In July, 1963, John was 70 months old; Karen, 57; Mari, 43; Shiela, 11; and Christopher, 0. Therefore, John had 182 remaining months of minority; Karen, 195; Mari, 209; Shiela, 241; and Christopher, 252; for a total of 1079. John's 182 months is 17 percent of 1079 months, and so forth through all five children.