Gale S. GILL, Individually and as Guardian of her Minor Children

v.

UNITED STATES of America.

Louise B. BARLOW, Indiv. and as Guardian of her Minor Children

v.

UNITED STATES of America.

Civ. Nos. 900, 903.

United States District Court
E. D. Texas,
Texarkana Division.
May 16, 1968.

Bun L. Hutchinson, Texarkana, Tex., for plaintiff, Louise B. Barlow.

Richard B. Hardee, First Asst. U. S. Atty., Tyler, Tex., for defendant.

FISHER, Chief Judge.

## MEMORANDUM OPINION

Two cases, grounded on the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., arose out of the same plane accident and were consolidated for trial and decision.

A Cessna Model No. 172 aircraft crashed near Easterwood Airport in College Station, Texas, at or shortly after 8:00 P.M. on September 12, 1963. The pilot, Dr. C. V. Bintliff, and his two passengers, Dr. John E. Gill and Mr. George P. Barlow, were killed. The three men had left the Texarkana Airport at 4:18 P.M., intending to fly to San Antonio. The Plaintiffs here, the widows of the two passengers, base their claims and those of their minor children on the Texas Wrongful Death Act, Arts. 4671 et seq., of the Vernon's Ann. Revised Civil Statutes of Texas.

Negligence has been alleged in various particulars which may be briefly combined and summarized as:

(1) Failure of Air Traffic Control at Texarkana, prior to take-off, and at Waco, enroute, to inform the pilot of the existing weather which would be encountered between Texarkana and San Antonio;

(2) Failure of the Waco Radar Approach Control Facility (RAPCON) to

relay exactly weather information secured by Waco from Austin;

(3) Suggestion and/or concurrence of Waco RAPCON in proposed flight plan which, it was known or should have been known, would encounter an untenable weather situation;

(4) Failure of Waco and Austin RAPCON to give warning of a recognized peril;

(5) The giving of misleading information by Austin RAPCON;

(6) Delay of personnel at Easterwood Airport in responding to calls from the plane;

(7) Erroneous report of weather conditions in Waco area given by personnel at Easterwood Airport; and,

(8) Failure to have available extra fuses which would have avoided the delay in lighting the runway at Easterwood Airport.

■ Application of the law to the facts here must be made within the framework of certain well-established legal principles. The primary responsibility for the safe operation of an aircraft is upon the pilot. Smerdon v. United States, 135 F.Supp. 929 (D., Mass., 1955); United States v. Schultetus, 277 F.2d 322 (2nd Cir. 1960) cert. den., 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56; New York Airways, Inc. v. United States, 283 F.2d 496 (2nd Cir. 1960); United States v. Hedburg, 217 F.Supp. 711 (D., So.Dak., 1963); Wenninger v. United States, 234 F.Supp. 499 (D., Dela., 1964), aff'd., 352 F.2d 523 (3rd Cir. 1965); Hartz v. United States, 249 F.Supp. 119 (N.D., Georgia 1965); De Vere v. United States, 268 F.Supp. 226 (E.D., No.Car., 1967).

■ Nevertheless, it is equally well recognized that the United States can be liable in tort in air crash cases if any negligent act of government personnel is a proximate cause of the injury. Eastern Airlines v. Union Trust Company, 95 U.S.App.D.C. 189, 221 F.2d 62 (C.A., D.C., 1955), aff'd., sub nom. United States v. Union Trust Company, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955); Air Transport Associates v. United States, 221 F.2d 467 (9th Cir., 1955); Ingham v. Eastern Airlines, 373 F.2d 227 (2nd Cir. 1967); Hartz v. United States, 387 F.2d 870 (5th Cir. 1968).

■ The Federal Tort Claims Act specifically adopts the law of the place where the accident occurs, as the law in accordance with which liability is to be determined. 28 U.S.C. §§ 1346(b) and 2671. Since the crash occurred in Texas, the Texas law of negligence and proximate cause is applicable. King v. United States, 178 F.2d 320 (5th Cir. 1950); United States v. Schultetus, 277 F.2d 322 (5th Cir. 1960), cert. den., 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56.

In this, as in other negligence cases, and particularly in air crash cases, the sequence of events leading up to the accident is most important. Plaintiffs have shown that prior to the time the plane became airborne at Texarkana, there were in existence two weather reports, San Antonio SIGMET No. 2 and Greater Southwest SIGMET No. 4, both of which indicated turbulent weather conditions in the area which would be encountered in flight from Texarkana to San Antonio. As the Defendant has pointed out, however, it was stipulated not only that certain weather data was provided to the pilot by the Flight Service Station attendant at Texarkana, but also that "there was no other weather information pertinent to his route of flight [i. e., Texarkana to San Antonio] available at the Texarkana Station at this time."

Between 5:25 and 5:28 p. m., a little more than an hour after take-off, the plane was in radio contact with the Gregg County Airport at Longview, and was not given the Greater Southwest SIGMET No. 4 report, nor was it given the SIGMET No. 2 report. Mr. John F. Dowdy, an employee of the Waco Combined Station/Tower, testified that he was in radio communication with the plane at 6:20 p. m.; that he read to the pilot both the San Antonio SIGMET No. 2 and the Greater Southwest SIGMET

No. 4, as well as the Austin and San Antonio Terminal Forecasts; and that he told the pilot the control frequently upon which he could contact the Waco RAPCON if he so desired.

Plaintiffs point to the fact that the testimony with regard to the Dowdy radio communication with the plane was not substantiated with a tape recording, as were all the other in-flight conversations with government personnel, and was not produced by the Defendant pursuant to Plaintiffs' Motion for Discovery and the Court's Order thereon. Even, however, if there is reason to infer that the plane did not receive the communications from Dowdy, there is no doubt that the pilot did contact the Waco RAPCON at about 6:20 or 6:21 P.M., with the request:

> "I'd like to know if you have any radar reports on our course. Intend to fly directly to Austin if we can and then direct from Austin to San Antonio. Over."

The Waco operator, Henson, told the pilot to stand by so that he could get information from Austin. The tape shows that at 6:27 P.M., the following dialogue took place beween Ormand, another Waco operator, and the Austin RAPCON:

> "#4　Go ahead Waco.
>
> ACT　Okay Austin we have a small aircraft uh southweast about thirty-five miles uh we would like to have some information on the precipitation areas say from about Belton on down to Austin.
>
> #4　Is he VFR type?
>
> ACT　Yes.
>
> #4　I'd suggest he land at Waco and wait a couple of hours.
>
> ACT　It looks pretty sad?
>
> #4　Yes, sir, it's solid. From uh Liberty Hill clear on over east of Taylor.
>
> ACT　Okay uh on past Taylor then uh?
>
> #4　Yeah, it's east of Taylor way east of Taylor and uh way west of uh the airway.

ACT　Okay we'll advise him. Thank you very much."

Thereafter, Henson, again in communication with the plane, at 6:28 P.M., reported:

> "A/C　Triple six seven Alfa Waco Approach uh Austin radar advises that they have ah numerous cells extending from Liberty Hill to Taylor, Texas (pause) and (pause) so apparently this precipitation area that starts about Temple extends on down into Austin area and he says that there are numerous cells to the (pause) that would be north and northeast of Austin over."

As Plaintiffs have emphasized, the above obviously was not an exact repetition of the information received in Waco from Austin. Although the pilot was given the information that a precipitation area extended over the Temple-Taylor Liberty Hill-Austin area, he must not have construed the report as indicating weather so severe that he would be well advised to land immediately. He continued his communication with the Waco operator and at 6:29 P.M., the following conversation took place:

> "N6667A—Six seven Alfa I think what I'll do I'll fly a southerly course till I intercept the uh victor sixteen radial off of the Austin omni now uh except and then fly that does that seem to be a pretty good course wouldn't you think? Over.
>
> A/C　Roger, the Austin omni is out of service, it will be off the air for approximately ten days uh the only facility they have that you could navigate on would be the Austin homing beacon on frequency two eight one kilocycles would you be able to uh navigate off of that?"

At 6:34 P.M., the pilot inquired whether he should go west to Waco and was advised that he should not. The transcript of the tape reads:

> "N6667A—Uh six seven Alfa then would you suggest that I fly uh west of Waco? Over.

A/C uh negative sir, that would just get you into the heavier area about the only way that it appears that you would be able to get around it would be to proceed uh south southeast of Waco as you suggested earlier and intercept a radial off of the Bergstrom VOR–TAC and proceed on in that direction. Over.

N6667A—Six seven Alfa that's what I'll do then. Thank you."

Henson testified that, if he had been informed of the Austin operator's recommendation that the plane land at Waco and wait two hours, he would have relayed it to the pilot. That he did not do so, therefore, indicates that he did not know of the recommendation.

The Austin operator was, however, informed that the plane was on the way. The transcribed conversation indicates that both Austin and Waco participants agreed that the pilot was "nuts" to continue the flight. At 6:44 P.M., the Waco operator attempted to reestablish communications with the plane but was unable to do so.

The flight had proceeded toward Austin, and at about 6:33 P.M., the pilot attempted to call the Austin RAPCON. The transmission was unintelligible, and the pilot was told that he would have to make contact after he came closer to the station. Subsequently, communication was established, and the pilot reported his position as 8 miles north of Rockdale. He was then told:

"Cessna triple six seven Alfa, looking at the scope, you're further out and it looks like the area in between uh Rockdale, Elgin, Manor to Austin will be satisfactory for you for VFR conditions."

Plaintiffs assert that the report was a "false invitation" to continue flight toward Austin. It is obvious, however, that the plane did not proceed in that direction but instead turned to the east.

The recorded tapes indicate that the next attempts made to communicate with ground personnel were at 7:08 and 7:18 P.M., when calls "in the blind" were transmitted to any airport which might receive them. Those calls were not answered. At 7:22 P.M. the pilot called Easterwood Airport on the correct frequency of 118.5 mc. and was immediately answered. In response to a request for weather information on Waco, the operator at Easterwood reported a 1200 foot ceiling rather than a 12,000 foot ceiling. Although that was, admittedly, an erroneous report, the incorrect information was not such as reasonably to deter the pilot from proceeding to Waco. A ceiling of only 1,000 feet is adequate for Visual Flight Regulation flying.

Shortly thereafter, while in communication with Easterwood, the pilot reported that he saw an airport beacon which Mr. Clarke, the controller at Easterwood, was able to identify from the pilot's description as being Coulter Field. Mr. Clarke advised the pilot that Coulter Field was neither paved nor lighted. The pilot then requested and was given reports on weather conditions in Austin as well as Waco. The pilot decided to attempt a landing as promptly as possible, rather than going on to Waco. Some of the pilot's communications with Easterwood Tower were:

"Six seven alpha uh lets see just a minute. Let me check my gasoline and so forth and I'll call you back in just a minute if you'll standby.

"Uh Easterwood Tower we are we could possibly make Waco comfortably maybe not comfortably I wonder is uh uh have you any planes land at your field in the last uh since you've had the rain? Over.

" * * * I think I need to land before trying Waco. I understand Temple is no good we may circumnavigate around this rain shower and (unintelligible) for us to try Waco is possible I would like for you to see if you could get about three cars on Coulter airport turn two of them down the runway and I think I can get in there if I can get in pretty soon before the rain hit there."

The transcript of the recorded conversations further shows that the pilot was advised that the Hearne Airport was paved and that Easterwood Control operator would check with the Hearne Airport manager to see whether that field could be lighted. The pilot was advised that visibility there had improved to two miles and was asked whether he would like to land. The reply was affirmative. Mr. Clarke obtained a special VFR clearance for the pilot to land at Easterwood at the pilot's request. He gave the pilot advice on how to reach the Easterwood Tower. Several minutes elapsed during which time the pilot had followed the wrong highway leaving Bryan. Thereafter, he called Easterwood again and was reoriented.

The weather conditions existing at Easterwood were extremely hazardous for the operation of a Cessna 172. There was an active thunderstorm in progress with rain, lightning, and wind gusting from a northwesterly direction at fifteen to twenty knots. The ceiling was indefinite with one thousand feet obscuration. Low puffy patches of clouds commonly called scud layers were present in multiple layers. In addition to these dangerous landing conditions, the pilot upon reaching Easterwood was required to hold the plane over a lighted area south of the airport. The fuse for the runway lights had blown, making an immediate landing impossible. While the pilot was holding his position, one of the Flight Service Station specialists, Mr. Kimbro, went out into the rain in the parking lot in order to bring his car around to the edge of the runway for the purpose of furnishing guidance for the pilot with his automobile lights. Mr. Kendrick, another Flight Service Station specialist, first attempted to get the runway lights back into service by switching fuses. When he was unable to do so by that method, he put a nickel in the fuse box and was able to restore the lights.

The pilot reported that he had the runway lights in sight and began to make his approach for landing. He was cleared to land on Runway 4. Approximately two minutes later the pilot was asked whether he still had the runway lights in sight, and he replied in the affirmative. Shortly thereafter the men on the ground lost sight of the aircraft, and no further transmissions from the pilot were received. After approximately four minutes, during which time numerous calls to the aircraft brought no response, rescue operations were initiated.

Six of the eight instances of alleged negligence, noted initially and described in more detail above, may be classified as incomplete or inaccurate reporting of weather information. The most pertinent reported decision is Ingham v. Eastern Air Lines, Inc., 373 F.2d 227 (2nd Cir., 1967), where it is specifically held that the failure to report weather conditions promptly and accurately constituted negligence on the part of the government personnel. It is true, as the Defendant has pointed out, that evidence in the *Ingham* case established violation of a regulation specifically controlling the personnel there involved, but the Court further pointed out (373 F.2d 236):

"It is now well esablished that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently."

Decisions supporting that rule include United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); and Hatahley v. United States, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); Neff v. United States, 282 F.Supp. 910, decided March 28, 1968, No. 354–65 (District of Columbia, Dist.Ct.). Applying the general rule to the specific situation there before it, the Court in the *Ingham* case continued (373 F.2d 236):

"Assuming, arguendo, that in the absence of FAA regulations approach controllers would not have to advise incoming aircraft of weather condi-

tions, the decision to provide such information would lead carriers and their pilots normally to rely on the government's performance of this service. The carriers, relying on the FAA to keep their pilots informed of current weather conditions, would be likely to reduce both the quantity and quality of their own weather reporting. In light of this reliance, it is essential that the government properly perform those services it has undertaken to provide albeit voluntarily and gratuitously. * * * "

■ Regardless, therefore, of the category of the particular air traffic control employee involved, his inaccurate and incomplete reporting of weather information is such negligence as may subject the government to liability under the Federal Tort Claims Act.

Some of the reports given to Dr. Bintliff, particularly from the Waco RAPCON, were inexact, incomplete, and in all reasonable probability misleading. It is further apparent that, at least for a time, he acted upon the basis of the inaccurate information given to him and the construction which he placed upon the reply to his suggestion of a possibly feasible route by which he might continue his flight toward San Antonio. Ultimately he did come close enough to Austin to communicate with the Austin RAPCON.

The evidence is conflicting as to whether the information given by the Austin RAPCON was or was not accurate. It is unnecessary, however, to determine that issue. The pilot did not accept what Plaintiffs have described as a "false invitation" to continue his flight toward Austin. Exercising his own discretion, he turned east and was next in contact with government personnel at Easterwood Airport at College Station. Again from Easterwood, the pilot was given an erroneous weather report on the height of the cloud cover at Waco. As was pointed out above, however, the report was such that it would not reasonably have influenced Dr. Bintliff's ac-

tions either to go to Waco or to land as promptly as possible.

■ Since Dr. Bintliff did not act upon the basis of the weather report from the Austin RAPCON and since the error in giving the height of the ceiling at Waco was immaterial to the pilot's decision as to his future conduct, those reports, although possibly constituting negligence in a technical or purely academic sense, merit no further consideration because neither could have been a proximate cause of the crash which resulted in the death of the pilot and his passengers.

The stipulation of the parties to the effect that Dr. Bintliff was given all pertinent weather information available at Texarkana prior to the beginning of the flight eliminates the need for determination of any question of negligence there. Thus, the only possibilities of actionable negligence in weather reporting are the omission of the San Antonio SIGMET No. 2 from the report given by the operator at the Gregg County Airport, in Longview, the variances between the report received from the Austin RAPCON by the Waco RAPCON and that relayed by Waco RAPCON to the plane, and the apparent approval by Waco RAPCON of the route of continued flight suggested by Dr. Bintliff. The failure to give warning of a recognized peril is simply a different facet of the negligence of the Waco RAPCON in omitting from the relay of information received from the Austin RAPCON the recommendation that the plane land at Waco and wait a couple of hours before continuing flight. The fact, as shown by the tape, that Waco ultimately attempted, unsuccessfully, to reestablish communication with the pilot indicates that the operator was himself concerned at least with some portion of his previous report and emphasizes the initial negligence in the giving of the incomplete and inaccurate relay report.

■■ In point of time, the first of the other two incidents of alleged negligence was the delay of personnel at East-

erwood Tower in responding to calls from the plane. The two calls upon which Plaintiffs have based their contention in this regard were shown by the tape to have been addressed "in the blind" to any airport which might receive them. The calls were not placed on the primary frequency which it was Easterwood's duty to monitor, and Easterwood was not called by name. Mr. Clarke, the Air Traffic Control specialist at Easterwood Tower on duty at the time, testified that he did not hear the calls. The hold that merely because such "in the blind" calls might have been answered by Easterwood would be to place upon Air Traffic Control personnel a greater duty than has been imposed by any other court and to assume, without any supporting evidence, that the government has undertaken to perform an all inclusive monitoring service. The basis for liability under Federal Tort Claims Act cannot, we believe, be so extended. The first call placed by Dr. Bintliff on the primary Easterwood frequency was promptly answered. It is, therefore, concluded that no negligence was shown on the part of Control personnel in failing to respond to the earlier calls from the plane.

■ The final circumstance alleged by Plaintiffs to constitute negligence is the absence of an available replacement fuse which caused a delay in restoring the runway lights at Easterwood Airport after Dr. Bintliff had determined to attempt a landing there. Easterwood Airport is maintained by Texas A & M University. There was no evidence to the effect that federal employees stationed there as Air Traffic Control personnel had any duty with regard to or responsibility for keeping extra fuses although unquestionably they had access to all of the electric power equipment. Clearly the duty to maintain adequate supply of extra fuses at an airport should rest upon someone. The failure to have extra fuses available was negligence in this instance even though the evidence is inconclusive as to the person or agency guilty of the breach of duty.

■ The problem of placing responsibility for the negligence in keeping the fuse box properly supplied would be accute if it were not for the fact that Dr. Bintliff was able to see the beacon light and to use it as a guide in continuing his flight toward the field. Moreover, the tape recorded conversation shows that, after the lights were back in service, Dr. Bintliff responded twice that he had the runway lights in sight. He was, therefore, in a position to land his plane —a position where the responsibility for his own safety and that of his passengers was solely his. All of the ground services for the landing had been supplied. There is no evidence to support a finding that the attempted landing and resulting crash was actually caused by an exhausted fuel supply which could be attributed in part to the negligent delay in restoring the runway lights.

■ The principal question before this Court is whether any of the earlier mentioned incidents of negligence were the proximate cause of the accident. There is no doubt that incomplete and inaccurate weather reports were responsible for placing the pilot in the perilous position of having to attempt a landing of a light place at night during a rather severe storm. The bare fact that the negligence of the defendant caused Dr. Bintliff to be in position where it was possible for an injury to occur is not in itself sufficient to sustain a finding of proximate cause. Phoenix Refining Company v. Tips, 125 Tex. 69, 81 S.W.2d 60 (1935).

■ The casual connection between the negligence of the Waco RAPCON and the accident is not complete without a finding that the storm probably caused the crash. A mere possibility that the severity of the storm caused the accident will not relate, unite and connect the final injury in a natural chain of events to the defendant's negligence. Thomas v. Magnolia Chemical Company of Texas, 394 S.W.2d 50 (Tex. Civ.App.1965), writ ref. n. r. e.; Hot Spot Detectors, Inc. v. Farmers Supply

Company of Hartley, 401 S.W.2d 109 (Tex.Civ.App.1966), writ ref. n. r. e.

There is a possibility that the crash was the result of an unknown intervening cause such as a malfunction in the airplane; but certainly there is no evidence in the record to support such a finding. Thus the issue is whether or not there is sufficient evidence for the Court to conclude that the crash was the natural and probable expected result to be experienced from an attempted landing of a light plane in the conditions prevailing at Easterwood at the time of the accident.

■ Considering all of the facts presented to the Court, we are of the opinion that the crash was caused by the extremely hazardous weather conditions existing at Easterwood airport, and further that the defendant through negligent weather reporting was responsible for placing Dr. Bintliff and his passengers in this perilous position which was the proximate cause of their death. Hopson v. Gulf Oil Corp., 150 Tex. 1, 237 S.W.2d 352, reh. den. (1951); Biggers v. Continental Bus Systems, Inc., 157 Tex. 351, 303 S.W.2d 359, reh. den. (1957); Petroleum Carrier Corporation v. Carter, 233 F.2d 402 (5th Cir. 1956); Neff v. United States, 282 F.Supp. 910, decided March 28, 1968 (District of Columbia, District Court, No. 354–65).

## DAMAGES

■ In an action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the law of the state where the cause of action arose is binding as to the measure of damages. United States v. Compania Cubana De Aviacion, S. A., 224 F.2d 811 (5th Cir. 1955); Cook v. United States, 274 F.2d 689 (2nd Cir.1960); Simpson v. United States, 322 F.2d 688 (5th Cir. 1963). Accordingly, this Court looks to the Texas rule of damages for wrongful death as related by Art. 4677, Vernon's Ann.Texas Civ.Stat.

■ The proper measure of damages is the present monetary value of the benefits that the plaintiffs had a reasonable expectation of receiving from the deceased had he not been killed. 17 Tex.Jur.2d p. 586. See Texas Consolidated Transportation Co. v. Eubanks, 340 S.W.2d 830 (Tex.Civ.App.1960), writ ref. n. r. e. These pecuniary benefits are not only money but everything that can be valued in money. Thus, in measuring the losses sustained by Mrs. Gill and Mrs. Barlow, the Court has taken into consideration the present value of care, counsel and attention, in addition to the foregone earning, which the decedents would have reasonably been expected to provide for their wives. Simpson v. United States, supra; Page v. Scaramozi, 288 S.W.2d 909 (Tex.Civ. App.1956), writ ref. n. r. e. The children are not limited to the pecuniary sums that their respective fathers probably would have contributed for their maintenance. They are entitled to recover the present value of the nurture, care, moral and mental training that their fathers would have provided. 17 Tex.Jur.2d p. 600.

■ Damages actually sustained by the family of Dr. Gill the Court finds to be the amount of $500,000.00, taking into consideration the deceased's earnings for the period from September, 1963, at the time of his death, to June, 1967, the time of trial; the deceased's future earnings, together with the general inflationary trend; discount of Federal Income Taxes; the estimated probable amount which the deceased would spend on himself; and discount for present value. Further, funeral expenses may properly be awarded in a wrongful death action. Smith v. Farrington, 117 Tex. 459, 6 S.W.2d 736 (1928). The evidence shows that $500.00 was spent by Mrs. Gill for this purpose. Mrs. Gill is also entitled to damages for attention, care and counsel, which the Court finds to be of the present value of $10,000.00; thus, the Court finds the amount of damages recoverable by the surviving wife of Dr. Gill to be the total sum of $260,-500.00.

The present value of the nurture, care, moral and mental training forgone by

Dr. Gill's children is placed at $500.00 per year for each child's remaining minority, which when combined with the children's share of net earnings provides a total of $268,900.00, to be apportioned in the following manner: [2]

|  | Age | Percentage | | Award |
|---|---|---|---|---|
| Susan | 14 | 18% | = | $48,402.00 |
| Marilyn | 12 | 23% | = | 61,847.00 |
| John | 10 | 27% | = | 72,603.00 |
| Janet | 9 | 32% | = | 86,048.00 |

The actual damages sustained by the family of Mr. Barlow the Court finds to be the amount of $275,000.00, taking into consideration the deceased's earnings for the period from September, 1963, at the time of his death, to June, 1967, the time of trial; the deceased's future earnings, together with the general inflationary trend; discount of Federal Income Taxes; the estimated probable amount which the deceased would spend on himself; and discount for present value. Of this amount, Mrs. Barlow is to receive fifty (50%) per cent, or $137,500.00, plus $10,000.00 compensation for the present value of the care, counsel and services of her deceased husband, and $915.00 for reasonable funeral expenses; thus, her total award is $148,415.00. The remaining fifty (50%) per cent net earnings of $137,500.00 is to be apportioned among the children, together with the present value of damages of parental care, training and guidance which is placed at $500.00 per year per child until majority, with the sole exception of Claire who, because of her blindness, is awarded $750.00 per year until she reaches the age of twenty-three, said apportionment being made as follows: [3]

|  | Age | Parental Care | Childrens' Percentage of Net Income | | Total Award |
|---|---|---|---|---|---|
| George | 12 | $ 4,500 | plus 17% | = | $27,875.00 |
| Charles | 9 | 6,000 | plus 23% | = | 37,625.00 |
| Gordon | 8 | 6,500 | plus 26% | = | 42,250.00 |
| Claire | 7 | 10,500 | plus 34% | = | 57,250.00 |

Judgment is to be entered for the Plaintiffs in the amounts above indicated, with interest from the date of judgment.

The Court further directs that all expenses, including attorney fees, be divided proportionately to the amount each individual received in relation to the entire judgment.

All costs shall be paid by the Defendant. Counsel for Plaintiffs shall submit an appropriate judgment consistent with the verdict of the Court, to be entered within thirty (30) days from this date.

2. The percentage figure assigned each child was derived by taking the remaining months of minority for each child as a percentage of the total months of minority remaining for the entire group.

3. The percentages were obtained by the same method used in computing the award for the Gill children, with the exception of Claire Barlow whose percentage figure is based on receiving support until the age of 23.