Ruth E. THINGULDSTAD, Individually and as Executrix of the Estate of Arthur M. Thinguldstad, Deceased, Plaintiff,

v.

UNITED STATES of America et al., Defendants.

Civ. A. No. 68-243.

United States District Court,
S. D. Ohio, E. D.

May 1, 1972.

Robert A. Batross, Miller, Pfiefer, Burkhart & Batross, Zanesville, Ohio, Charles E. Brown, Crabbe, Brown, Jones, Potts & Schmidt, Columbus, Ohio, for plaintiff.

Thomas W. Reilly, Trial Atty., Federal Aviation Administration, Washington, D. C., William W. Milligan, U. S. Atty., Columbus, Ohio, Gary Brinsfield, Asst. U. S. Atty., Trial Atty., Columbus, Ohio, Herbert L. Lyons, Aviation Unit, Tort Section, Civil Division, Department of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER

KINNEARY, District Judge.

Plaintiff, Ruth E. Thinguldstad, brought this action individually and as executrix of the estate of Arthur M. Thinguldstad, deceased, against the United States under the provisions of the Federal Tort Claims Act. The jurisdiction of this Court was invoked under the provisions of Title 28, United States Code, Section 1346(b).

As required by Title 28, United States Code, Section 2402, this action was tried to the Court without a jury. As required by Rule 52, Federal Rules of Civil Procedure, the Court's findings of fact and conclusions of law shall appear in this opinion.

Plaintiff commenced this action against the United States and others who were dismissed as party defendants prior to the trial of this action. At the time of trial only the claim against the United States remained for adjudication. Plaintiff alleges that the United States, by and through its agents, employees of the Federal Aviation Agency, was negligent in the manner in which they controlled and directed the movement of an aircraft piloted by Arthur M. Thinguldstad and a T.W.A. Constellation, Flight 383, which were utilizing the facilities of the Port Columbus International Airport at Columbus, Ohio, on or about 6:45 p. m. on September 28, 1966. It is plaintiff's position that due to the negligence of the F.A.A. employees at the Columbus Control Tower, plaintiff's decedent, Arthur M. Thinguldstad, while operating a Piper-Cherokee aircraft, encountered wake turbulence caused by a T.W.A. Constellation and that such encounter caused the Piper-Cherokee aircraft to crash, resulting in the death of Arthur M. Thinguldstad.

The specific acts of negligence alleged will appear in the Court's discussion of the evidence in this case.

Title 28, United States Code, Section 1346(b) states that the United States shall be liable, "in accordance with the law of the place where the act or omission occurred." Because the alleged acts of negligence and the crash and consequent death of plaintiff's decedent occurred in Ohio, the law of Ohio governs the liability of the United States in this wrongful death action under the Federal Tort Claims Act. However, although the law of Ohio governs with respect to questions of negligence and proximate cause, the liability of the United States may

also be affected by federal regulations which impose duties or standards on the conduct of the employees of the United States. Gill v. United States, 429 F.2d 1072 (5th Cir. 1970).

It is a matter of well established law that the United States can be liable in tort in an aircraft crash case if any negligent act of government personnel is a proximate cause. Gill v. United States, 285 F.Supp. 253 (E.D. Tex.1968); Sawyer v. United States, 297 F.Supp. 324 (E.D.N.Y.1969). Under Ohio law an action for negligence involves three essential elements: first, the existence of a duty owing by the defendant to the plaintiff; second, defendant's failure to discharge that duty; and third, injury to the plaintiff proximately resulting from such failure. 39 O.Jur.2d Negligence, Section 9. Plaintiff must establish each of these elements, and in the event that the cause of injury to the plaintiff may be as reasonably attributed to an act for which the defendant is not liable as to one for which he is liable, plaintiff has not sustained the burden of showing that his injury is a proximate result of the negligence of the defendant. See, 39 O.Jur. 2d Negligence, Section 139, p. 712, n. 5.

### Findings of Fact

It is plaintiff's position that the plane piloted by the deceased, Arthur M. Thinguldstad, crashed because it encountered wake turbulence while on approach for landing at Port Columbus International Airport.

The phenomenon of wake turbulence is also known as wing tip vortices. The phenomenon is described in the case of Lightenberger v. United States, 298 F. Supp. 813, 823 (C.D.Calif., 1969) as follows:

. . . the passage of the wings [of a heavy aircraft] through the air causes a roll-up of the air mass at the tip of each wing. The air mass continues to swirl much in the same manner as a tornado, except that its position in the air is horizontal. The force of the resulting tornados is proportional to the weight, wing span and speed of the aircraft.

In September of 1966 when this crash occurred, the phenomenon of wake turbulence or wing tip vortices was well known and had been the subject of warnings to pilots of small aircraft for a number of years. The evidence established that wake turbulence can be a hazard to small aircraft. Upon encountering wake turbulence a small aircraft might experience violent pitching or rolling or a sudden gain or loss in altitude. The encounter with wake turbulence can be extremely dangerous to a small aircraft on takeoff or landing when the aircraft is operating at a very low altitude. Wake turbulence of such violence as to be a hazard to small aircraft is generated behind and slightly below heavier aircraft.

It is the plaintiff's theory that the aircraft piloted by the plaintiff's decedent encountered the wake turbulence generated by a T.W.A. Constellation shortly after the Constellation flew over the Thinguldstad aircraft. Plaintiff's allegations of negligence on the part of employees of the United States are predicated on the theory that the air traffic controllers at the Port Columbus International Airport Control Tower were negligent in sequencing the arriving aircraft so that the T.W.A. Constellation would fly over, down and in front of the light aircraft piloted by Arthur Thinguldstad. Plaintiff also alleges that the air traffic controllers were negligent in failing to give Mr. Thinguldstad a timely and proper warning of wake turbulence, in failing to maintain a proper separation in time and distance between the T.W.A. Constellation and the Thinguldstad aircraft, in failing to properly communicate between the radar room and the tower, and in failing to properly communicate with the aircraft involved.

The evidence clearly established that both the T.W.A. Constellation and the Thinguldstad aircraft were approaching the Port Columbus International Airport with a view to landing on runway 28–L. At a point about seven miles from the end of runway 28–L the T.W.A. Con-

stellation overtook and flew over the Thinguldstad aircraft. About twenty seconds later the local controller at the Columbus tower resequenced the Thinguldstad aircraft to land behind the T.W.A. Constellation. Prior to that resequencing, the Thinguldstad aircraft had been No. 2 to land behind another small aircraft. As part of the same transmission in which the aircraft were resequenced, the Columbus tower presented to Pilot Thinguldstad a choice of runways. About thirty seconds later, the local controller again asked Pilot Thinguldstad whether he wanted to follow the Constellation in on runway 28–L, or whether he wanted runway 31. Pilot Thinguldstad answered this question with the word "affirmative", and the Columbus tower responded, "All right, sir. Plan your approach for 28–left, follow that T.W.A. Constellation." No warning of possible wake turbulence was given until about two minutes later, or at about the time that the Thinguldstad aircraft crashed.

■ Attorneys for the plaintiff and Mr. Francis M. McDermott, a witness for the plaintiff, have been diligent and even creative in their efforts to call the Court's attention to various provisions, regulations and procedures which plaintiff claims were violated by the air traffic controllers. The Court has carefully considered all of the alleged violations of provisions, regulations and procedures and has determined that even if the conduct of the air traffic controllers could be said to have violated the various regulations cited by the plaintiff, these violations of operating procedures were not a proximate cause of the air crash.

Plaintiff's case is predicated on an encounter with wake turbulence which encounter plaintiff alleges was inevitable due to the negligent sequencing of the aircraft involved. Based on the evidence adduced at trial, the Court determines that (1) plaintiff has not shown by a preponderance of the evidence that there was actually an encounter with wake turbulence, (2) even assuming that there was an encounter with wake turbulence, plaintiff has not shown by a preponder-ance of the evidence that such encounter resulted in the crash of the Thinguldstad aircraft, and (3) the defendant has introduced sufficient evidence to establish an explanation for the crash of the Thinguldstad aircraft which explanation the Court determines to be as plausible as that advanced by the plaintiff.

I

At the time of the crash, Pilot Thinguldstad was flying from Zanesville, Ohio to Port Columbus International Airport at Columbus, Ohio. There was evidence adduced from which the Court could infer that Pilot Thinguldstad was flying an airway designated as Victor 214. A T.W.A. Constellation was also flying on Victor 214. To a pilot flying a plane equipped with a V.O.R. receiver, the boundaries of an airway are demarkated by a radio beam. The airway was approximately eight miles wide. See, 14 C.F.R. § 71.5(b) (1). A pilot could be flying four miles to either side of the radio beam and still be considered to be on the airway. Moreover, there was testimony that even if a pilot was attempting to fly right on the beam the calibration of his equipment could result in a lateral displacement of one mile to either side of the signal.

The blanket of wake turbulence generated by the T.W.A. Constellation which flew over and down in front of the Thinguldstad aircraft did not cover an area of more than a few hundred feet. Indeed, the testimony of the government expert, Mr. William McGowan, was to the effect that if the Thinguldstad aircraft were as little as one hundred twenty-three feet to the left of the flight path of the Constellation, it would not have encountered the wake turbulence at all.

In addition to the assumptions which plaintiff made with respect to the relative flight paths of the T.W.A. Constellation and the Thinguldstad aircraft, the plaintiff was also required to make assumptions regarding the respective altitudes, glide slopes, speed, wind conditions and drift and settling rate of the wing tip vortex system in order to support the theory that the Thinguldstad

aircraft crashed because of an encounter with wake turbulence. As an example of the complicated and speculative nature of the assumptions made by the plaintiff, it was necessary for plaintiff to estimate the viewing angle from the cockpit of the Thinguldstad aircraft as the plaintiff reported various check points to the Columbus tower. The only facts pertinent to the cause of this air crash which can be determined with any precision are the point of impact and the time of the various transmissions to and from the aircraft involved. After carefully weighing the testimony of the experts for both parties, the Court determines that the few established facts will support the assumptions of the defendant to the same extent that they support the assumptions of the plaintiff.

With the government's assumptions as starting points, and using the same reasoning relied on by the plaintiff, the evidence would show that the encounter with wake turbulence, if it occurred at all, would have occurred at a point 3.4 miles from the end of the runway. That is over a mile east of the place where the crash actually occurred.

## II

Even assuming that the Thinguldstad aircraft did encounter wake turbulence there is no evidence that the encounter resulted in the crash of the aircraft. On the assumption that the T.W.A. Constellation and the Thinguldstad aircraft were flying on exactly the same path toward runway 28–L, the plaintiff's experts, based on the various assumptions indicated in the preceding paragraph, concluded that the encounter with wake turbulence took place almost directly above the spot where the Thinguldstad aircraft impacted with the ground. The impact point was about two miles from the end of runway 28–L. The government's calculations, premised on equally plausible assumptions, indicate that any encounter with wake turbulence would have taken place approximately 3.4 miles from the end of runway 28–L. If wake turbulence were encountered at 3.4 miles

out, the evidence indicated that Pilot Thinguldstad would have flown through it by the time he reached a spot over the impact point. The evidence clearly established that the aircraft which Pilot Thinguldstad was flying had the capability to overcome any sudden loss in altitude due to wake turbulence.

Moreover, both parties estimate that at the point of encounter with wake turbulence the Thinguldstad aircraft was flying at about one thousand feet above the terrain. The eyewitnesses to this crash testified that from their vantage points the Thinguldstad airplane appeared to nose over and come straight down, nose first. The experts from both sides agreed that, had the Thinguldstad aircraft been caught in one of the vortex cores, there would have been pitching or rolling of the aircraft. A straight down sudden loss of altitude would result when a smaller aircraft flew between the two wing tip vortex cores. However, the government expert testified that if an aircraft did encounter wake turbulence by flying directly between the vortex cores, even if the plaintiff did nothing, he would lose between sixty-five and eighty-five feet in altitude and then resume normal flight above the wake turbulence.

## III

The defendant adduced substantial evidence which would indicate that the Thinguldstad aircraft crashed due to pilot incapacitation. Plaintiff's exhibit 33 contains a death certificate signed by a Doctor Evans which indicates that a determination as to cause of death was "pending". A supplemental death certificate was included as part of plaintiff's exhibit 33, as indicated by plaintiff's list of exhibits incorporated in the final pretrial order. However, plaintiff apparently determined it to be to her advantage to withdraw this document during trial and it was never offered into evidence. Thus the Court was deprived of the objective conclusion which the supplementary certificate would have contained with respect to cause of death.

Defendant has urged in his post trial memorandum that the Court take judicial notice of the supplementary certificate as evidence of the cause of death. The Court knows of no authority for such judicial notice, and such notice is not necessary for the Court's determination of the issues in this case. The Court believes that the testimony of the government experts and the findings contained in the official autopsy report, also part of plaintiff's exhibit 33, provide a legally sufficient basis for the Court's findings of fact.

The official autopsy report on Arthur W. Thinguldstad indicates a recent and early organizing, proliferating thrombosis of the anterior descending branch of the left coronary artery. This thrombus caused a ninety-five percent occlusion of the left coronary artery. Aside from the thrombus there was other evidence of widespread arteriosclerosis. Other evidence of heart disease included the fact that decedent's heart weighed 420 grams, whereas the normal heart will weigh between 300 and 350 grams for an adult male.

The government called as an expert witness Dr. Edwin E. Westura. Dr. Westura is an expert in cardiovascular disease and has been board certified in the area of cardiovascular disease. Among his other appointments, Dr. Westura has been the director of the Cardio-Pulmonary Division of the St. Louis University School of Medicine. It was Dr. Westura's opinion that Mr. Thinguldstad's death was caused by acute coronary artery thrombosis and its consequent effects which resulted in sudden incapacitation.

The plaintiff called two doctors who were specialists in internal medicine. Neither of these doctors was board certified in the sub-specialty of cardiovascular disease. Plaintiff's experts did testify that it was possible that a ninety-five percent occlusion in the coronary artery would not be fatal if a patient had sufficient collateral circulation to make up for the blockage. However, the autopsy report will not support that assumption because the autopsy disclosed widespread arteriosclerosis. In addition, the autopsy disclosed that deceased had accumulated ten percent carbon monoxide in his blood supply. The reduced oxygen in deceased's blood supply, coupled with the massive thrombus which blocked ninety-five percent of the anterior descending branch of the left coronary artery, are sufficient evidence to establish that pilot incapacitation rather than a wake turbulence encounter caused the crash of the Thinguldstad aircraft.

*Conclusions of Law*

Based on all the evidence and testimony presented in the case, the Court determines that plaintiff has not met his burden of proof and plaintiff has not established, by a preponderance of the evidence, that any negligence on the part of the government employees proximately caused the Thinguldstad aircraft to crash. The requirement of a preponderance of evidence is not satisfied if the evidence is in equipoise, and in such case the party having the burden of proof must fail. He who has the burden of proof must prove each material fact in controversy by a preponderance of the evidence, and a judgment could not be founded upon mere speculation. 21 O.Jur.2d Evidence, Section 696 n. 56. See also, Michalec v. Hutchison, 123 Ohio St. 494, 176 N.E. 79 (1931); and Spaulding v. United States, No. 25315 (C.D.Cal. Jan. 28, 1972). The United States has presented an acceptable explanation for the crash. *Cf.* Lightenburger v. United States, supra, 298 F. Supp. at p. 839.

The Court further concludes as a matter of law that there exists a second and independent legal basis for denying plaintiff any recovery on the facts of this case.

The primary responsibility for the safe operation of an aircraft is upon the pilot. See, Gill v. United States, 285 F.Supp. 253 (E.D.Tex.1968) and cases cited therein. Moreover, the pilot must exercise ordinary care for his own safety under the circumstances which confront him. See, Wasilko v.

United States, 300 F.Supp. 573 (N.D. Ohio, E.D., 1967), aff'd 412 F.2d 859 (6th Cir. 1969). All of the information contained in F.A.A. Advisory Circular AC90–23A (plaintiff's exhibit 9), concerning the nature and danger of wing tip vortices is chargeable to Pilot Thinguldstad. See, Wasilko v. United States, *supra* at p. 598. This pilot had been flying since 1957 and, according to his wife's testimony, received and regularly read various publications directed to pilots. At least one of these publications, the August 1965 issue of the A.O.P.A. Pilot Magazine, was admitted into evidence as government's exhibit M and contained an article detailing the danger of wake turbulence.

If Pilot Thinguldstad was indeed flying directly into the blanket of wake turbulence laid down by the T.W.A. Constellation, he was in the best position to realize this. There is no doubt from the evidence that Pilot Thinguldstad saw the T.W.A. Constellation pass over, down and in front of him. Pilot Thinguldstad chose to take no evasive action, and he declined to accept the alternate runway for landing which was suggested by the local controller at the Columbus tower. The Court has carefully considered all of the cases cited by the plaintiff and the Court notes that plaintiff has cited no previous decision in which the Court has allowed a pilot operating under VFR conditions to recover against the United States for injuries sustained as a result of a mid air encounter with wake turbulence.

Indeed, all the wake turbulence cases cited by the plaintiff recognize that the defense of contributory negligence bars a pilot from recovering for injuries sustained as a result of a wake turbulence encounter.

The case of Wenninger v. United States, 234 F.Supp. 499 (D.Del.1964) is similar on its facts to the case before this Court. In *Wenninger* the decedent was flying at between 1500 and 2000 feet when he encountered wake turbulence generated by an airforce C–124. The Court found that the decedent's family was not permitted to recover be-cause of Pilot Wenninger's contributory negligence. The Court stated that, under VFR weather conditions the ultimate responsibility for the safe operation of an aircraft rests with the pilot. The pilot is under a duty to observe and avoid other traffic, even if flying with traffic clearance.

The case of Lightenburger v. United States, *supra,* can be distinguished from the case before this Court on two grounds. First, the pilot in *Lightenburger* was making a PAR approach rather than a VFR approach. A PAR approach is conducted by advisories received by the pilot from a radar operator. Second, the Court in *Lightenburger* noted that the evidence excluded any failure on the part of the pilot or aircraft. The evidence in the case before this Court, as indicated above, does indicate that pilot incapacitation, rather than wake turbulence, is an alternative explanation for the crash of the Thinguldstad aircraft.

In the only wake turbulence case where a pilot flying under VFR conditions was allowed to recover, the Court found that the aircraft controller was in a better position to appreciate the possibility of wake turbulence than was the pilot himself. Hartz v. United States, 387 F.2d 870 (5th Cir. 1968). In *Hartz,* the pilot crashed when he encountered wake turbulence on takeoff. The Court found that the controller was the one better qualified by training, experience and vantage position to estimate time and distance and it was his duty to direct and guide the small aircraft which Hartz was flying in a manner consistent with its safety and the safety of all who might be affected by its operation.

The Court further said that it was the controller's responsibility to appropriately warn Hartz of the possible danger of wing tip vortices from the large commercial airliner which was departing immediately ahead of him. The facts presented to this Court are substantially different from those presented to the Court in the *Hartz* case. In this case, the respective aircraft were about two miles from the controllers' vantage point,

and it was nearly dark. Under these conditions, it was the duty of Pilot Thinguldstad, flying under visual flight rules, to maintain a safe separation. See, United Air Lines, Inc. v. Wiener, 335 F.2d 379, 389 (9th Cir. 1964), cert. den. United Air Lines, Inc. v. United States, 379 U.S. 951, 85 S.Ct. 452, 13 L. Ed.2d 549 (1965) and cases cited therein.

The value of the *Hartz* case as precedent in this action is diminished by the fact that in Wasilko v. United States, *supra*, recovery was denied where the pilot encountered wake turbulence shortly after takeoff. And cf. Furumizo v. United States, 245 F.Supp. 981, 991 (D. Hawaii 1965). A pilot has a continuing duty to be aware of danger when, with his own eyes, he can perceive the danger. The ultimate responsibility for the safe operation of aircraft under VFR weather conditions rests with the pilot.

Based on the authorities cited above, the Court determines that the contributory negligence of plaintiff's decedent bars any recovery.

Based on the foregoing findings of fact and conclusions of law, the Court determines that judgment should be and hereby is entered for the defendant.