Charlotte Joan YATES, Administratrix of
the Estate of Thomas Lester Yates,
deceased, Plaintiff,

v.

UNITED STATES of America,
Defendant.

EAGLE STAR INSURANCE COMPA-
NY, LTD., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. Nos. 9278, 9309.

United States District Court,
D. New Mexico.

April 16, 1973.

Magana & Cathcart, Los Angeles, Cal., James J. McCarthy, Los Angeles, Cal., of counsel and Avelino V. Gutierrez, Albuquerque, N. M., for plaintiff Charlotte Joan Yates.

Keleher & McLeod, Albuquerque, N. M., for plaintiff Eagle Star Ins. Co.; Dennis M. McCary, Albuquerque, of counsel.

Victor R. Ortega, U. S. Atty., D.N.M., Albuquerque, N. M., Mark A. Dombroff, George Farrell, James Dillman, Attys., U. S. Dept. of Justice, Washington, D. C., for defendant United States; W. R. Hughes, Jr., Asst. U. S. Atty., of counsel.

PALMIERI,* District Judge.

*Preliminary Statement*

These consolidated actions under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), arise out of a fatal airplane accident which occurred on August 3,

---

* Of the Southern District of New York, sitting by designation.

1969, at the Albuquerque International Airport. The accident occurred in the early evening in good weather and while it was still light. The pilot and sole occupant of the plane, a Cessna 172 model aircraft, was Thomas Lester Yates. His surviving widow and administratrix, Charlotte Joan Yates, is suing in her own behalf and in behalf of three surviving minor children. The plaintiff in the companion case is asserting a liquidated insurance interest in the destroyed aircraft and its entitlement to recovery rests entirely on the resolution of the issues in the *Yates* case.

The trial took place in Santa Fe, New Mexico, on October 30 and 31, and November 1 and 2, 1972. The Court sat without a jury, as required by 28 U.S.C. § 2402.

The facts were substantially as follows. The decedent was about to terminate a flight from Grants, New Mexico, to the Albuquerque International Airport. He was guided in by two Federal Aviation Administration (FAA) controllers. Their instructions by radio and the precise times at which they were given were recorded and became part of the evidence at trial. One controller, a trainee, was in charge of the radar approach control and was the first of the two to be in communication with the plane. The second, the local tower controller, had a visual view of the approaching planes and of the field from the glass enclosed cab at the top of the airport traffic control tower. The controllers had a direct telephone line at their disposal. Referred to as a "hot line," this interphone circuit was used in this instance by the radar approach controller (Sanger) on the one hand, and the cab coordinator (Moore) who assisted the local tower controller (Haines) and coordinated his functions with those of the approach controller. The taped record of this "hot line" conversation contains only the words of the radar approach controller. The words of the cab coordinator were not recorded. These recorded radio conversations of the two controllers with the decedent and of the radar approach controller with the cab coordinator on the "hot line" were of crucial importance in reconstructing the facts shortly before the crash.

The fatality occurred when the Cessna airplane operated by Yates was caught in the wake turbulence[1] of a preceding TWA jet, a 707 Boeing plane. The Cessna plane struck the ground in an inverted position. The pilot was crushed and died instantly. There can be no doubt that the small Cessna was caught in wake turbulence of such severity that the pilot lost control of his aircraft. The Government sought to prove that the decedent's aircraft crashed as a result of stalling and not because of wake turbulence. This contention, based upon opinion testimony, is negated by the overwhelming body of credible evidence and by the defendant's own accident report.

It is undisputed that pilots can expect to receive wake turbulence warnings when, in the judgment of the controller

---

1. The phenomenon of wake turbulence, also known as wing tip vortices, is described in Lightenberger v. United States, 298 F.Supp. 813, 823 (C.D.Cal.1969) as follows:

"[T]he passage of the wings [of a heavy aircraft] through the air causes a roll-up of the air mass at the tip of each wing. The air mass continues to swirl much in the same manner as a tornado, except that its position in the air is horizontal. The force of the resulting tornados is proportional to the weight, wing span and speed of the aircraft."

It is common ground that wake turbulence is generated behind and slightly below heavier aircraft. The air turbulence thus created is invisible and moves rapidly in circular fashion, forming a vortex. Depending upon wind velocity it may remain for periods ranging from a few minutes to as much as ten or twelve minutes. The paths of the vortices descend, moving apart laterally, eventually striking the ground where they are dissipated. An illustrative film was shown at the trial by the Government and much expert testimony was devoted to the subject of wake turbulence at the trial. A small aircraft flying at the low altitudes necessitated by take-off or landing and encountering wake turbulence is in a very dangerous if not disastrous situation.

such a warning is necessary. Indeed the evidence established that such warnings have been frequently given at the airport in question. The Government has stressed throughout the case that this was a matter for the controller's sound judgment and that he exercised sound judgment in failing to give the warning. The evidence demonstrated, however, that under the facts of this case sound judgment required that such a warning be given.

Additionally the evidence indicates that the radar approach controller and the local tower controller had a misunderstanding with respect to the sequencing of the approaching aircraft and were not, therefore, effectively coordinating their functions. The placing of the Cessna into a tight landing pattern between two larger, heavier and faster planes, a Trans-Texas Convair 580 turboprop and a TWA Boeing 707 was a tragic and faulty decision.

The findings of fact and conclusions of law which follow are intended to amplify what has already been said and to demonstrate that the wrongful death of plaintiff's decedent was proximately caused by the negligence of the FAA controllers: (1) in failing to provide adequate separation between the decedent's aircraft and the preceding Boeing 707 jet transport type aircraft; (2) in advising decedent to keep his aircraft close behind the preceding 707 jet aircraft and in telling him at the same time that there were other planes behind him; and (3) in failing to advise decedent of the presence and hazard of wake turbulence caused by the preceding jet transport type aircraft.

## FINDINGS OF FACT

1. Plaintiffs are Charlotte Joan Yates, acting as administratrix of the Estate of Thomas Lester Yates, deceased, and Eagle Star Insurance Company, Ltd. as the insurance company which had in force and effect at the time of the accident a policy of aircraft hull insurance covering the destroyed aircraft. As administratrix, Charlotte Joan Yates maintains this action in a representative capacity for and on behalf of herself as the surviving widow of Thomas L. Yates, and on behalf also of three surviving minor children of the deceased Thomas L. Yates.

2. Plaintiff Eagle Star Insurance Company, Ltd. is subrogated to all rights and claims against defendant United States of America for property loss to the Cessna 172 H aircraft resulting from the crash occurring on August 3, 1969.

3. The plaintiff's decedent, Thomas Lester Yates, was the sole occupant and pilot in command of a Cessna 172 H model aircraft bearing FAA registration Mark N1662F which crashed on its final approach to Albuquerque International Airport (the airport) on August 3, 1969. The plane was a total loss. The decedent was operating the said plane with the consent of Thomas G. Humphries, the lessee of the aircraft.

4. At the time of this crash the Cessna 172 H model aircraft which crashed was insured by a policy of flight insurance issued by plaintiff Eagle Star Insurance Company, Ltd. to Thomas G. Humphries d/b/a El Dorado Aviation. Mr. Humphries was leasing the aircraft from Mr. Yvon W. Collins of Crown Point, New Mexico, the registered owner. The crash constituted a loss insured under the terms of said insurance policy and plaintiff insurance company made payment to its insured as a result of the crash. The plaintiff insurance company is subrogated to all rights of its insured against defendant United States of America by reason of said payment.

5. At the time of the fatal crash which is the subject of this lawsuit, the decedent left surviving his widow, Charlotte Joan Yates, age 24, his daughter Robin Yates, age 5, his son Ira Yates, age 3, and his daughter Kimberly Yates, age 1 month.

6. At the time of the fatality on August 3, 1969, Yates held a private pilot's license. He was undergoing training

for a commercial license. He had a total of approximately 97 hours of flight time and had flown into the airport in question on two or three occasions.

7. At the time of the accident, flight visibility was some 60 miles and temperature was 76 degrees. The air traffic at Albuquerque was moderate. It was daylight and Visual Flight Rules (VFR) were in effect.

8. At the time in question all aircraft were compelled to use runway 17 which is a north-south runway. The east-west runway had been closed for some time prior to August 3, 1969, because of construction operations. The wind was coming from 170°, almost from due south, at 10 knots. All planes were landing from the north to the south.

9. Runway 17 was approximately 9000 feet long. The air traffic control tower situated to the south of runway 17 had an unimpeded view of this runway except for the approach end and to the extent of approximately 1500 feet. The lack of a complete view of the runway in question from the air traffic control tower has no significant relationship to this case.

10. The air traffic control tower was operated by the United States and was in operation on the day and at the time of the accident.

11. The circular glass enclosed section permitting observation in all directions is situated at the top of the air traffic control tower and is known as the tower cab. The lower portion of the control tower contains the radar room and has no windows.

12. At the time of the accident the local or tower control position in the tower cab was manned by William A. Haines. The approach control position in the radar room was manned by Donald J. Sanger. Mr. Sanger, at the time of this accident, was a trainee at the radar approach control position and was not fully qualified to perform his duties. He was supervised by another controller,

Mr. Nattress, who was "plugged in" on the same radio channel, but so far as the record reveals Mr. Nattress played no part in any of the relevant events. Both Mr. Haines and Mr. Sanger were employees of the Federal Aviation Administration.

13. At the time of the accident, William E. Moore, an employee of the Federal Aviation Administration, was in the tower cab acting as cab coordinator. He was acting as liaison between the approach controller situated in the radar room, and the local controller situated in the tower cab. Mr. Moore's function, as cab coordinator, was to assist both controllers in carrying out their duties. He served as a second pair of eyes and ears for the local controller with whom he communicated verbally, or in writing or by touching and pointing. Mr. Moore passed on information from the approach controller to the local controller. Mr. Moore had a direct telephone line to the approach controller which could be activated by the flip of a switch. This was known as the hot line.

14. The initial sequencing of arriving aircraft for approach and landing was carried out on August 3, 1969, by the radar approach controller.

15. At approximately 7:46 M.D.T.[2] on August 3, 1969, on a flight from Grants, New Mexico, the decedent Thomas L. Yates first communicated by radio with the FAA Air Traffic Control Facility at the Albuquerque International Airport. The decedent informed the approach controller he intended to land at Albuquerque International Airport.

16. The approaching aircraft shortly before the accident were: 430, a Cessna; TWA 52, a Boeing 707; 62F, a Cessna 172 (the decedent's plane); a Convair 580 turboprop, Texas International (Trans-Texas) 691; and a twin-engine Cessna, (Trans-Central) 112.

17. The approach controller acknowledged the initial communication from the decedent and instructed him to land

on runway 17 and to utilize a right traffic pattern in his approach and landing.

18. At approximately 7:53 M.D.T., the decedent was instructed by the approach controller to follow the TWA 707 aircraft. The 707 aircraft is a considerably faster, larger and heavier aircraft than is the Cessna 172. This communication was acknowledged by the decedent and he advised Mr. Sanger that he had the TWA 707 in sight.

19. Immediately thereafter, and at approximately 7:54 M.D.T., Mr. Sanger, the approach controller, advised the decedent to contact the local control position for further landing instructions. The decedent acknowledged this instruction. There were no further communications between the decedent and Mr. Sanger, the approach controller.

20. At no time did Mr. Sanger, the approach controller, give the decedent a cautionary warning concerning the existence of wake turbulence.

21. In establishing the approach sequence, the approach controller had the duty to consider the relative speeds of the aircraft involved.

22. The approach speed of a 707 would be approximately 140 knots and the approach speed of a Cessna 172 would be approximately 80 knots.

23. At approximately 7:55 M.D.T., the decedent first communicated with the local controller.

24. In his first transmission to the decedent at approximately 7:54, the local controller, Mr. Haines, instructed the decedent to continue in the same approach sequence he had been placed in by the approach controller.

25. Approximately one minute later, at 7:55 and 56 seconds, Mr. Haines instructed the decedent in precisely these words: "Keep your traffic in close behind that TWA jet, there's others behind you." This was an improvident and negligent instruction.

26. At the time or immediately after this instruction to the decedent there was confusion or a misunderstanding between the two controllers with respect to the landing sequence of the approaching aircraft. The next following plane was the Trans-Texas Convair 580, a far heavier and faster plane than the decedent's aircraft which was being rapidly overtaken by it. It is likely that the instruction of Mr. Haines, quoted in Finding of Fact No. 25, was precipitated by the potential sources of danger posed by the positions of the preceding TWA 707 and the following Trans-Texas Convair 580. In squeezing the decedent's light plane between the two larger, heavier and faster planes, the local controller apparently entertained the erroneous belief that he needed to get the light Cessna plane of decedent on the ground before the decedent was run over by the following plane.

27. Prior to receiving this instruction, the decedent had been flying a flight path that would have kept him further behind the 707.

28. After receiving this instruction, the decedent altered the flight pattern of his aircraft to come in closer behind the 707.

29. Prior to receiving this instruction, a Trans-Texas Convair 580 turboprop aircraft had been sequenced behind the decedent's Cessna 172 and was following in a landing pattern very closely behind the Cessna 172.

30. The TWA 707 touched down at a point on runway 17 beyond its intersection with the east-west taxiway and as a result was unable to turn off at said taxiway but instead had to taxi to the end of the runway and turn around so as to turn off at a taxiway near the end of the runway. This long landing by the TWA 707 plane precluded the possibility of an emergency landing by the decedent's plane at a point beyond the touchdown of TWA 707 on runway 17, assuming it were possible for the decedent's plane to have flown over the TWA 707 in order to make such a landing. The expert testimony adduced by the defendant in order to demonstrate that the decedent could have avoided the wake turbulence by flying over the TWA 707 and landing beyond it is rejected as

unpersuasive in the factual context of this case.

31. When the decedent was told by the local controller, Mr. Haines, to "keep your traffic in close behind that TWA jet, there's others behind you," the decedent had no choice under the circumstances which then confronted him except to obey the instruction. The words "there's others behind you" could reasonably have conveyed to the decedent the following meaning: you have to hurry to get out of the way.

32. The local controller had a far better view and a more complete knowledge of the approaching air traffic than the decedent. It was reasonable for the decedent, given the surrounding circumstances, to rely upon the local controller's instructions. The words of the local controller quoted in Finding of Fact No. 25 were likely to have caused him to effect the immediate compliance with these instructions which in fact occurred. While the decedent could conceivably have refused to comply with the clearance given him by controller Haines, he could not, under the surrounding circumstances, have made an adequate appraisal of the total situation so as to make a safe and quick decision on his own initiative. The navigation of aircraft to a safe landing is a delicate and engrossing task even under optimum conditions. In this instance, and in the light of the circumstances which confronted him, the decedent acted reasonably in relying upon the controller's clearance instructions.

33. At no later than 7:58 and 40 seconds, the crash occurred as a direct and proximate result of the Cessna 172 aircraft encountering the wake turbulence generated behind the TWA 707.

34. The wake turbulence generated by the TWA 707 was encountered by the Cessna 172 at an altitude of approximately 200–300 feet and at a distance of not more than one mile behind the 707.

35. At the time the Cessna 172 aircraft encountered the wake turbulence, there was nothing the pilot could do to prevent the crash since he no longer had control of the aircraft or the flight pattern of the aircraft.

36. The Cessna 172 was caused by the encounter with the wake turbulence to go over on its back and to strike the ground in an inverted position.

37. The decedent, Thomas L. Yates, was killed as a proximate result of the crash and the impact of the aircraft with the ground.

38. At no time did Mr. Haines, the local controller, give the decedent a cautionary warning concerning the existence of wake turbulence.

39. Had a wake turbulence cautionary warning been given, it is reasonable to infer that the accident would not have occurred.

40. Mr. Haines, the local controller, knew as of August 3, 1969, that wake turbulence was dangerous and created a hazard for a lighter aircraft following a heavier aircraft.

41. Mr. Haines, the local controller, knew as of August 3, 1969, that wake turbulence could cause a pilot to lose complete control of his aircraft and if that occurred, at a low enough altitude, it would result in a crash.

42. Mr. Haines, the local controller, knew as of August 3, 1969, that he had a duty to warn the pilot of a following, lighter aircraft of the existence of wake turbulence, if he considered the wake turbulence a hazard to the following aircraft. This duty was imposed on Mr. Haines at the time of this accident by the FAA Terminal Air Traffic Control Manual, Section 255.

43. On August 3, 1969, the decedent, Thomas Lester Yates, had a total of approximately 97 hours of flying time and was not a pilot of long experience. A pilot with the decedent's limited background and experience in flying, although qualified, would rely heavily on instructions received from air traffic controllers. However, the fact that the decedent was a "low-time" pilot had no significant relationship to the fatal accident.

44. Mr. Sanger, the approach controller, was negligent in the following particulars:

a.—in establishing an unsafe approach sequence and instructing the decedent to follow the 707 aircraft without establishing a safe lateral separation between the two aircraft.

45. Mr. Haines, the local controller, was negligent in the following particulars:

a.—in continuing the unsafe sequence which had been established by Mr. Sanger without more precise instructions to the decedent as to how to establish his pattern in order to follow the 707 in safety.

b.—in failing to issue a wake turbulence warning to the decedent as he was required to do by the terms of the FAA Terminal Air Traffic Control Manual under the circumstances then and there existing.

c.—in instructing the decedent to "keep your traffic in close behind that TWA jet, there's others behind you," since such an instruction compelled the decedent to alter his flight pattern and bring his aircraft into a dangerous position behind the 707.

46. Each of the acts of negligence found in Findings of Fact Nos. 44 and 45 was a direct and proximate cause of the crash and decedent's death.

47. The decedent Thomas Lester Yates was not negligent in any manner in the operation of his aircraft on August 3, 1969, and no negligence on the part of the decedent contributed as a proximate cause of the accident. His aircraft did not stall at any time relevant to this lawsuit. The Government's contention that the decedent's plane crashed as the result of stalling was based upon opinion testimony which the Court finds to be unpersuasive. The overwhelming weight of the evidence, and indeed the defendant's accident report (defendant's Exhibit 4), establish that the proximate cause of the crash was the encounter of the Cessna 172, the decedent's aircraft, with the wake turbulence generated behind the preceding Boeing 707 (TWA 52).

48. At the date of his death, the decedent, Thomas Lester Yates, was 29 years of age.

49. The decedent, Thomas Lester Yates, was employed as a contract miner in Grants, New Mexico, and had been so employed since at least the year 1963.

50. The decedent's earnings for the years 1967, 1968 and 1969 (through July) were as follows: 1967: $10,892.-00; 1968: $14,144.00; 1969: (through July) $7,278.00.

51. At the time of his death, the decedent was married and had three children. His widow, Charlotte Joan Yates, was 24 years of age at the date of his death, and his children Robin Yates, Ira Yates and Kimberly Yates were ages 5, 3 and 1 month of age respectively at the date of his death.

52. The measure of damages in New Mexico for wrongful death is the present worth of the life of the decedent to his estate. Stang v. Hertz Corporation, 81 N.M. 69, 463 P.2d 45 (Ct. of App. 1970). The widow Charlotte Joan Yates and her three minor children are the statutory beneficiaries of the judgment awarded in this wrongful death action and they share equally in the net amount of the proceeds. Section 22-20-3 HOGSA, 1953 Comp. Each of them is therefore entitled to receive one-fourth of the judgment rendered herein.

53. The decedent had a high school education and was in good health. He rendered household services in the approximate amount of ten hours per week to the household. It is likely that his income would have increased with the passing years. It is unlikely that he would have remained a miner for the rest of his life. He had met the qualifications for a pilot's license and was working to achieve a commercial pilot's license when he was killed.[3]

2. See appendix.

54. The loss to the estate of the household services of the decedent, when reduced to its present value, was in the sum of $22,367.00.

55. The total damages found to have been sustained by the estate of the decedent, Thomas Lester Yates, are in the sum of $375,540.00, plus costs and interest as allowed by law. This amount is arrived at by adding $22,387.00 set forth in the preceding finding to $353,153.00, which represents the present value of earnings foregone for the years 1969–2004, based upon a 5% increase factor to age 50, and .5% per year to adjust for average decreases experienced by high school graduates from age 50–64.

56. As stipulated by the defendant United States of America, the damages sustained by plaintiff Eagle Star Insurance Company, Ltd. are in the sum of $8,500.00, plus costs and interest as allowed by law.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and of the parties to this litigation. 28 U.S.C. § 1346(b).

■ 2. The wrongful death of Thomas Lester Yates having occurred in the State of New Mexico, and his death having been proximately caused by negligent acts and omissions which occurred in the State of New Mexico, the *lex loci delicti commissi,* and hence the applicable substantive law, is that of the State of New Mexico, 28 U.S.C. §§ 1346(b), 2674; Richards v. United States, 369 U. S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961); Marcum v. United States, 452 F.2d 36 (5th Cir. 1971).

■ 3. The United States is liable in tort where an aircraft crash is proximately caused by the negligent acts or omissions of government personnel. Thinguldstad v. United States, 343 F. Supp. 551 (S.D.Ohio 1972); Gill v. United States, 285 F.Supp. 253 (E.D. Tex.1968); Sawyer v. United States, 297 F.Supp. 324 (E.D.N.Y.1969).

4. The plaintiff has sustained her burden of proof and has established by a preponderance of the evidence that government employees, two FAA controllers, were negligent and that their negligence proximately caused the crash of the decedent's aircraft and his wrongful death.

5. The defendant has failed to prove that the decedent's aircraft crashed as the result of stalling.

6. The defendant has failed to sustain its burden of proving by a preponderance of the evidence that the decedent was contributorily negligent. The cases relied upon by the Government, Thinguldstad v. United States, 343 F. Supp. .551 (S.D.Ohio 1972) and Sanbutch Properties, Inc. v. United States, 343 F.Supp. 611 (N.D.Cal.1972), are clearly distinguishable on their facts and are therefore inapplicable here. In United States v. Furumizo, 381 F.2d 965 (9th Cir. 1967), the court went so far as to hold, in affirming a judgment against the United States in an air turbulence disaster case that where the controllers, having given a wake turbulence warning, actually saw a light plane start to take off in apparent disregard of that warning and without waiting long enough for the wake turbulence to dissipate, and the controllers did nothing to stop the plane, negligence was established. Here the fault was far greater. The controllers placed decedent in a position of extreme danger and without any warning whatever.

■ 7. As a direct and proximate result of the wrongful death of the decedent, Thomas Lester Yates, Charlotte Joan Yates, as administratrix of his estate, is entitled to recover damages in the sum of $375,540.00.

8. Plaintiff Charlotte Joan Yates, as administratrix of the estate of Thomas Lester Yates, is entitled to recover her costs in this suit and interest at the rate of four (4%) per cent per annum from the date of judgment pursuant to 28 U. S.C. § 2411(b).

■ 9. As a direct and proximate result of the property loss to the Cessna 172 model aircraft, plaintiff Eagle Star

Insurance Company, Ltd. is entitled to recover damages in the sum of $8,500.-00.

10. Plaintiff Eagle Star Insurance Company, Ltd. is entitled to recover its costs of suit and interest at the rate of four (4%) per cent per annum from the date of judgment pursuant to 28 U.S.C. § 2411(b).

Submit proposed judgment on notice consonant herewith.

## APPENDIX

Finding of Fact 53:

Two distinguished economic experts, Dr. Everett Dillman and Dr. David Hamilton, were called by the plaintiff and defendant, respectively, on the issue of economic loss. Their conclusions were substantially at variance. Dr. Dillman fixed the economic loss for the plaintiff at $535,582.00. This consisted of two principal amounts—$494,472.00 for income foregone, and $41,110.00 for loss of household services. Dr. Hamilton, on behalf of the defendant, fixed the economic loss at $264,742.00—consisting of $242,355.00 for income foregone, and $22,387.00 for loss of household services.

In two important respects, the Court, in reaching its conclusions, has substantially accepted the premises adopted by Dr. Dillman rather than Dr. Hamilton. First, Dr. Dillman used the highest annual income available from Yates's earning history, namely, $14,144.00 for the year 1968. The defendant's expert averaged the three available income years for an annual average income of $12,504.00. The disparity with regard to the basic annual income amounted to very substantial differences in work-life loss calculations before discounting. Dr. Dillman arrived at a figure of $670,045.-00, while Dr. Hamilton arrived at a figure of $455,142.00. Additionally, Dr. Dillman used a 5% annual rate to increase Yates's income for promotions, increases in productivity and inflation, derived from a table for all workers with a high school education, while Dr. Hamil-

ton used 3.6% as the rate of increase derived from a table relating to the economic history of miners. The Court has concluded that Dr. Dillman's assumptions in these two respects are on the whole more consonant with the reasonable inferences to be drawn from the record than Dr. Hamilton's. In sum, the figures set forth in the conclusions represent an attempt by the Court to avail itself of Dr. Hamilton's conclusions without, however, accepting his two premises regarding the basic annual income figure and the rate of increase percentage. With regard to the loss to the estate of the household services of the decedent, the Court has accepted Dr. Hamilton's calculation of $22,387.00.